LOUISVILLE TRUST CO. v. CINCINNATI INCLINED-PLANE RY. CO.
(GOODMAN, Intervener).

(Circuit Court, S. D. Ohio, W. D.   December 24, 1897.)

1. RAILROADS—CONSTRUCTION OF MORTGAGE—SUBSEQUENT EXTENSION OF LINE.
   A mortgage by a railroad company of "the railway, rails, bridges, and real estate * * * belonging to or held by said company," and "all the tolls, incomes, issues, and profits to accrue from the same or any part thereof," does not cover an after-acquired line or extension of the road, as it is, in terms, limited to that then owned by the mortgagor, and the income mortgaged is also limited to that accruing "from the same."

2. SAME—ROLLING STOCK.
   A clause in a mortgage by a railroad company covering, "all and singular, the cars and rolling stock * * * of said company," cannot be extended by construction to include any more than the cars and rolling stock then owned by the mortgagor.

3. SAME—EXTENSION OF LINE—MORTGAGE OF FRANCHISE.
   A mortgage by a railroad company of, "all and singular, its franchises and property, both real and personal," cannot be held by such language to include property subsequently acquired by the company, through the exercise of a franchise it then possessed, for the purpose of adding to or extending its line.

4. SAME—MORTGAGE OF INCIDENTS AND APPURTENANCES.
   A clause in a railroad mortgage extending it to "all the rights, easements, incidents, and appurtenances unto the hereby-granted premises belonging or in any wise appertaining" will not include future-acquired extensions of the line; nor will a statement in the mortgage that it is made under and by virtue of all and every power and authority in the mortgagor vested have the effect of enlarging the meaning of the language used in describing the property mortgaged.

5. SAME—MORTGAGE ON EARNINGS—NECESSARY ADDITIONS TO ROLLING STOCK.
   A mortgage by a railroad company in Ohio, where the power exists, under the law, to mortgage after-acquired property, which, though it contains no after-acquired property clause in terms, includes the railroad and rolling stock, and all the tolls, incomes, issues, and profits to accrue from the same or any part thereof, extends to and covers also future-acquired rolling stock and equipment purchased for, and needed in the operation of, the road mortgaged, and without which the income covered by the mortgage could not be earned.

6. SAME—EFFECT OF OHIO STATUTES.
   There is nothing in the statutes of Ohio relating to the extension of lines of railroad, or authorizing a change in the proposed location of such lines, which has the effect of extending a railroad mortgage, by operation of law, to cover after-acquired property which would not be included by the terms of the mortgage, construed by the rules of the common law.

This is a bill filed by the Louisville Trust Company, as trustee under a mortgage or deed of trust, duly recorded, given to it on the 1st day of January, 1889, to secure an issue of 500 bonds of $1,000 each, with interest thereon at 6 per cent. per annum, payable semi-annually, of which bonds $375,000 have been certified by the trust company, and sold to various persons, and are outstanding. The remainder of said issue, amounting to $125,000, not having been certified, remain in the hands of the complainant, as trustee, to take up a previous issue.

The bill showed a default in the interest, and the right to foreclose. A receiver was appointed and put in charge of the road, and is now in possession. W. A. Goodman filed his intervening petition, praying for the foreclosure of

a prior mortgage, dated January 1, 1879, and duly recorded, given by the same defendant (the Cincinnati Inclined-Plane Railway Company) to Goodman, as trustee, to secure bonds amounting to $125,000 issued by that company, and in the hands of various holders for value. The averments of the intervening petition show a default of interest on the mortgage to Goodman, trustee, and a right on his part to a foreclosure of the same. By leave of court, an answer has been filed by Goodman, trustee, to the amended bill of the complainant, the Louisville Trust Company; and an answer has been filed by the Louisville Trust Company to the intervening petition of Goodman, trustee. It has not been disputed that the Louisville Trust Company and Goodman, trustee, have the right to foreclose their respective mortgages; and the only question now to be decided, and which arises upon the pleadings of these two parties, is that of priority between the mortgages with reference to the rolling stock, and to the part of the railroad of the Cincinnati Inclined-Plane Railway Company which extends from the Zoological Garden to Carthage, in Hamilton county. The case was referred to a master to make a finding of certain facts. That finding has been made, and no exceptions have been taken thereto. From the findings and the evidence accompanying the same, it appears that in 1879 the Cincinnati Inclined-Plane Railway Company, organized under an act of May 1, 1852, as a steam-railroad company, owned an inclined plane extending from Locust street, on Mt. Auburn, down to the head of Main street, at its intersection with Mulberry; that in connection with its inclined plane it owned a horse railroad running from the foot of the inclined plane down Main street to Court, west on Court street to Walnut, south on Walnut street to Fifth, east on Fifth street to Main, and north on Main street to the inclined plane; that at the head of the inclined plane it owned a street railroad running from the inclined plane north on Locust street to Mason, east on Mason street to Auburn avenue, north on Auburn avenue to Vine street, north on Vine street to the Zoological Garden, and (returning by another track) south on Vine street from the Zoological Garden to Auburn avenue, south on Auburn avenue to Mason, west on Mason to Locust, and south on Locust to the inclined plane; that the termini of the road thus laid out and operated were Fountain square, in the city of Cincinnati, and the village of Avondale; that the inclined plane was operated by steam, and the street railroad used in connection therewith was operated by horses. The mortgage to W. A. Goodman, trustee, recites that the bonds and mortgage were issued "for the purpose of paying the debts of the company incurred in the extension of the company's road and the increase of its equipment." This, it is conceded, refers to the extension of the road made in 1878 from Vine street north to the Zoological Garden, and to other changes between the termini on Fifth street, in the city of Cincinnati, and the Zoological Garden. By the mortgage to Goodman the mortgagors granted, bargained, and sold, under and by virtue of the power and authority in them vested by the laws of the state of Ohio, "and of all and every power and authority in them in any wise vested, to the said Henry Peachey and William A. Goodman, trustees as aforesaid, their heirs and assigns, and the heirs and assigns of the survivor of them, by way of mortgage, all and singular, the railways, rails, bridges, and real estate, and all the tolls, income, issues, and profits to accrue from the same or any part thereof, belonging to or held by said company, and, all and singular, the cars and rolling stock, and also, all and singular, the franchises and property, real and personal, of said company, including said leased railway, together with all the rights, easements, incidents, and appurtenances unto the hereby-granted premises belonging or in any wise appertaining." The leased railway referred to in this description was route No. 8, now an expired grant from the city, part of the line of which was embraced in the double-track railway between the Zoological Garden and Fifth street. The road between Fifth street and Avondale was operated from 1879 until 1889, when permission was obtained from the city of Cincinnati to equip the line with electrical appliances. At that date the mortgage to the Louisville Trust Company was issued, and, of the proceeds of that mortgage, $375,000 were used to equip the road with electricity, and to extend it, under and by virtue of a vote of the stockholders in accordance with section 3306 of the Revised Statutes of Ohio, from the Zoological

Garden to Carthage, Hamilton county. The distance from Fifth street to the Zoological Garden is about three miles, and that from the Zoological Garden to Carthage is about eight miles. The application of electricity to the road required the purchase of some 17 or 18 large cars, equipped with electrical motors, together with the erection of poles and the relaying of the track. The mortgage to the Louisville Trust Company, it is not disputed, covers the whole road, together with after-acquired property. The only question to be decided is whether the mortgage to W. A. Goodman, trustee, covers more than the line of the road from Fifth street to the Zoological Garden, and more than the personal property, including the rolling stock, that was in existence January 1, 1879, when the Goodman mortgage was given.

St. John Boyle and Humphrey & Davie, for Louisville Trust Co.
Follett & Kelley, for W. A. Goodman, trustee.

TAFT, Circuit Judge (after stating the facts as above). The grant in the mortgage was, first, of "the railways, rails, bridges, and real estate * * * belonging to or held by said company." Now, there is not a word here containing the slightest suggestion that these words refer to future-acquired property. In the absence of such words, they must be construed to mean such property then in existence and owned by the mortgagor. The grant was, second, of "all the tolls, incomes, issues, and profits to accrue from the same or any part thereof." This language limits the income, tolls, and profits to those accruing from "the railways, rails, bridges, and real estate" then in existence and owned by the mortgagor. To hold otherwise would be to ignore the plain effect of the words "to accrue from the same or any part thereof." A vigorous argument has been made to sustain the claim that the words "income, tolls, and profits" manifest the intention of the mortgagor to mortgage the subsequently acquired extension of the railway, because income was necessarily future, and includes by implication the means of producing the same, and so would embrace after-acquired property from which such income could be derived. It is said that this is the necessary effect of the case of Coe v. Railroad Co., 10 Ohio St. 372. It was there held that the power to pledge property and income implied the power to pledge after-acquired property, because income would be derived from property then owned and to be acquired. The reason why the construction of the statutory power of a company in that case can have no application to the case at bar is that here the income pledged is expressly limited to that derived from the previously described railway and real estate, which, as already said, was the railway and real estate then owned by the mortgagor company. Whether income, tolls, and profits from such railways and real estate may include future to be acquired rolling stock and equipment needed to earn the income from the existing railway is a different question, and will be considered later. The grant, third, was of, "all and singular, the cars and rolling stock." This language cannot be extended to include any more than the cars and rolling stock then owned by the mortgagor. The grant, fourth, was of the franchises and property, real and personal, of said company, including said leased railway. This included the franchises then owned by the mortgagor, except the franchise of its incorporators to be a corporation, and the then owned real and personal property of

the mortgagor. It is suggested that, as these franchises included the franchise to add to the property already owned and to extend the railway, it should be held that the mortgage of such a franchise and the property includes property which might be acquired under such a franchise. I cannot see why this should be so. It is one thing to mortgage a right, and quite another to mortgage property acquired under and by virtue of the exercise of the right. The right does not include the property. Jones, Corp. Bonds, § 97. Finally, the grant is of "all the rights, easements, incidents, and appurtenances unto the hereby-granted premises belonging or in any wise appertaining." No words are here used that can be strained to mean future-acquired extensions of the line.

It is further said that because, under the case of Coe v. Railroad Co., 10 Ohio St. 372, the mortgagor company had the power to mortgage its subsequently acquired property, and because the mortgagors granted what they did grant expressly "under and by virtue of the power and authority in them vested by the laws of the state of Ohio, and of all and every power and authority in them in any wise vested," the mortgagor company must be held to have granted subsequently acquired property. This is an unwarranted use of the language quoted. All that these words can mean is that the mortgagors wish their act to be valid, and rely on every possible source of authority for the same. They do what they do by virtue of all of their powers, however derived; but an expression of a desire to validate the act cannot logically enlarge or change the character of the act as it is described in the words which follow, and which we have just been considering. It follows from what has been said that, unless the statutes of Ohio provide otherwise, the mortgage of Goodman covers the inclined plane, and only the railway, or so much thereof as is still in existence, extending from the inclined plane south to Fifth street, and from the inclined plane north to the Zoological Garden, and does not cover the extension of the railway from the Zoological Garden to Carthage.

Let us recur now to the question left open,—as to whether the mortgage of the income to accrue from the railway then existing and owned by the mortgagor does not include subsequently acquired rolling stock and machinery used in connection with the railway to earn the income, profits, and tolls accruing therefrom. I think this must be answered in the affirmative. No tolls or income or profits could be earned from the railway without rolling stock and equipment. The mortgage of the income would give the mortgagee the right to take possession of the mortgaged railway upon condition broken, and take and enjoy the income, but no income could be earned without the rolling stock then in use upon the railway. As against the grantor, therefore, it must be taken that it intended to mortgage with its railway all the rolling stock owned by it and used by it during the existence of the mortgage from which it would earn an income subject to the mortgage. This is the effect of Justice McLean's reasoning in Coe v. Pennock, 5 Fed. Cas. 1172, and of the case of Pullan v. Railroad Co., 4 Biss. 35, Fed. Cas. No. 11,461. See, also, State v. Northern Cent. Ry. Co., 18 Md. 193.

The question remains how this view will affect the lien upon the rolling stock and equipment in the case at bar. The first mortgage will certainly cover all the machinery and equipment used to run the inclined plane, whether new or old. It will also cover all the electrical machinery in the power house at the head of the inclined plane, because that was needed to earn the income from the railway covered by the first mortgage. Of the rolling stock, however, it is quite manifest that it would not all be needed to operate 3 miles of road, when it is sufficient to operate 11 miles of road. An equitable estimate, then, of the rolling stock needed to earn the income from the 3 miles of road, could be founded on the proportionate mileage, or three-elevenths of the entire rolling stock now in use. This estimate may need amendment, if it is true that more rolling stock is needed on the city end of the line than in the rural district; and Goodman, trustee, may have a reference to the master upon this point, if he desires it. I do not think that the fact that part of the three miles of track between the Zoological Garden and Fifth street has been lost to the mortgagor by expiration of franchises and otherwise ought to have any effect to reduce Goodman's pro rata share of the rolling stock, because the rolling stock was for a long time used on the whole three miles, and, being so used, it was properly included within the personal property needed to produce the income to accrue from the three miles of road mortgaged, and the mortgage lien then attached to it. The power to mortgage after-acquired property, real and personal, is established in Coe v. Railroad Co., 10 Ohio St. 372, and in Coopers v. Wolf, 15 Ohio St. 523. The only question here is whether the parties have intended to do so in this case, and have used apt words for this purpose. For the reasons stated, I conclude that the words used are apt only to cover future-acquired rolling stock and equipment purchased and needed in the operation of the three miles of road owned by the mortgagor in 1879, when the mortgage was executed.

I do not think the statutes of Ohio give this mortgage an effect different from that it would have at common law. The section of the Revised Statutes of Ohio relied on is 3306, which is as follows:

"When a company desires to extend the line of its road beyond either of its previously designated termini, the president and directors of the company may submit the question of such extension and change of termini to a meeting of its stockholders, to be called for that purpose, by notice published for four consecutive weeks in some newspaper in general circulation in each county through or into which it passes; and if the holders of the majority of the stock, in person or by proxy, so determine, the president and directors, or a majority of them, shall make a certificate of the fact, naming the places of the new terminus or termini of the road, and the county or counties through or into which the extended line will pass, and file it in the office of the secretary of state, and such certificate and extension shall be considered and held to be a part of the original line of the road."

The words of this section relied on are, "and such certificate and extension shall be considered and held to be a part of the original line of the road." This section was passed March 20, 1875 (72 Ohio Laws, p. 70), as an act supplementary to the general railroad act of May 1, 1852. The supplementary act was passed April 17, 1872, and is found in 69 Ohio Laws, p. 163. It is therefore to be treated as

in pari materia with the general railroad law of May 1, 1852, and the words requiring the extension to "be considered and held as part of the original line" are to be understood in connection with that act. Without examining in detail the provisions of that act, it is sufficient to say that in a number of sections powers are conferred upon the railway company to act with reference to its railroad line, such as the power to appropriate private property, the power to change the grade, the power to occupy streets, the power to fix prices for transportation, the power to acquire lands by purchase, the power to cross roads or streams of water, the power to consolidate with two or more companies, the power to aid other companies, and also the power to pledge property and income. The obvious meaning of this is that, when the road is extended, the operation of the road, and the powers of the company with respect to the road, shall be the same with respect to the extended line as if the line had originally included the extension. But the fact that the power of the railroad company is extended to mortgage both the original line and the extension, as if the extension had been included in the original line, is not a reason for inferring a legislative intent that a mortgage (which is a grant and contract between private parties) should be construed to include more than the words of the grant would ordinarily cover. Something much more specific than this is needed to show the legislative purpose to vary the ordinary effect of words in a grant or contract between individuals, when both have full liberty to shape the meaning thereof as may seem best to them.

There are certain other sections upon which reliance is had to support the contention of Goodman. Those sections are as follows:

"Sec. 3272. A company may, by a resolution adopted by a majority of its board of directors, at a meeting thereof duly called for the purpose, with the written consent of three-fourths in interest of its stockholders, change the line, or any part thereof, and either of the proposed termini, of its road; but no change shall be made which will involve the abandonment of any part of the road either partly or completely constructed; and any subscription of stock made upon the faith of the location of such road, or a part thereof, upon any line abandoned by such change, shall be canceled at the written request of the subscriber not having consented thereto, filed with the secretary or other chief officer of the company, within six months after such change.

"Sec. 3273. When any such change is made, the same shall be described in such resolution, a duly authenticated copy of which, under the seal of the company, shall be filed with the secretary of state, and by him recorded, with proper reference, on the record of the articles of incorporation of the company, and when so filed, such change shall be considered as made, and shall be as valid and binding as if such changed line had been the line originally described in such articles.

"Sec. 3274. When any such company has issued its mortgage bonds for the construction of its road, the record of the mortgage securing the same, in each county through or into which the changed line of the road passes, shall be as effectual to create a lien upon the changed line of road, and upon the property of the company, as if such mortgage contained a complete description of such changed line and of such property."

They are the first, second, and third sections of "An act relating to changing proposed lines and termini of railroads," passed April 7, 1876, and found in 73 Ohio Laws, p. 115.

In my opinion, the sections have no application whatever to the present case. They were intended to apply to a road which has been

projected, and not completed. The change therein referred to is a change of plan before the plan has been executed. The change is a change of proposed lines and proposed termini, not an extension of a completed railroad. That is covered by section 3306, already mentioned and discussed. Section 3274 (the section referring to the line covered by the mortgage) was a section intended to enable a corporation that had issued a mortgage upon a road to be constructed to change its plants without the necessity of issuing a new mortgage. It will be observed that section 3272 forbids any change which will involve the abandonment of any part of the road either partly or completely constructed; re-enforcing the view that the act refers only to a projected line in process of construction, but which has not been completed. It is evident that the officers of the inclined-plane company did not suppose that this section had any application, because they did not obtain the written consent of three-fourths in interest of the stockholders of the company to change the line or to change the termini. They proceeded under section 3306, which applies to a completed line, and which requires for the change of termini only a vote of the majority of the stock.

For the reasons given, I am clearly of opinion that the statutes of Ohio have no bearing upon the construction of the mortgage to Goodman, trustee, and that within its four corners there is no language to be found which justifies the view that it covers anything more than the road which was owned and in operation at the time the mortgage was given, together with the fixtures, rails, poles, and wires since added thereto, the new equipment of the inclined plane, and such proportion of the rolling stock which has since been substituted for the rolling stock then in use as may properly be said to have been necessary to produce the income from the three miles of road which was mortgaged. The decree for sale under the amended bill of the complainant and the intervening petition of Goodman, trustee, may be prepared in accordance with the views herein expressed.