GOULD v. HEAD et al.

(Circuit Court, D. Colorado. February 1, 1890.)

1. ASSOCIATIONS—ARTICLES—CONSTRUCTION—POWERS OF TRUSTEES.
    The trustees of an unincorporated "trust," organized for the purpose of acquiring, holding, and disposing of the capital stock of corporations engaged in a particular line of business, whose articles of association authorize them "to acquire, receive, hold, and dispose of the title to" such stock, have power to sell any such stock to third persons.

2. CORPORATIONS—STOCK—SUIT TO COMPEL TRANSFER—PARTIES.
    In a suit to compel the officers of a corporation to register a transfer of corporate stock, the corporation is not a necessary party.

3. SAME—DEFENSES—AGREEMENT NOT TO TRANSFER—CONSIDERATION.
    In such a suit an agreement between the complainant's vendor and the defendant, from whom he purchased the stock, that such vendor would not transfer it to any third person, is not a good defense, where it appears that such agreement was made after the defendant had sold the stock to complainant's vendor, and no consideration is alleged for the agreement.

4. SAME.
    In such a suit, an answer alleging that the complainant had acquired the stock without consideration, for the purpose of obtaining control of the corporation to the exclusion of defendant, and all other persons interested therein, states a good defense.

In Equity.

This cause was heard by Judge PHILIPS, of the western district of Missouri, under order of the circuit judge. The questions to be decided arise on exceptions taken by the complainant to the separate answer of the respondent Head, and on demurrer to the bill by the respondent Warren. The substantive allegations of the bill are that the Phœnix Farm & Ranch Company is a corporation of the territory of New Mexico, organized for the purpose of doing a general cattle business, with a capital stock of $160,000, divided into 1,600 shares, of $100 each; that its principal place of business is the town of Watrous, Mora county, N. M., with its principal office at the town of Las Vegas, N. M.; and that the respondents pretend to be, and assume to act as, directors of the company. It is alleged that on April 4, 1889, the complainant, for good and valuable consideration by him paid to the owners thereof, acquired 1,596 shares of this stock; that at the time of his purchase he received from the vendors certificates numbered 11, 12, 13, and 14, for 399 shares each, which certificates were indorsed on the back thereof, in blank, by

the former owners; that complainant became, and is now, the absolute owner thereof. It is alleged that the only interest of the respondents in the capital stock of this company consists in the ownership of one share each of the stock, which was transferred to them simply to qualify them to act as directors of the company. It is then alleged that on the 13th of April, 1889, complainant presented two of such certificates, numbered 11 and 13, representing 798 shares, to the respondent Warren, the secretary of said company, at his office in Denver, Col., and demanded of him that the transfer of said shares be registered upon the books of the company, and that a new certificate be issued to him therefor, which request was denied by said Warren. The bill further alleges that the respondents, although representing in fact but three shares of the capital stock of said company, yet retained in their possession all the books and papers of the company, are managing its affairs, purchasing and disposing of cattle, and incurring, in a reckless way, obligations of the company; that they refuse to recognize complainant as a stockholder, or to admit him to any participation in the management of the affairs of the corporation. The bill further alleges that, under the law of its creation and its by-laws, the directors can only hold their annual meetings for the election of directors at said town of Watrous, in New Mexico, and charges that the respondents are about to proceed to hold such election at Denver, Col., and asks that they be restrained therefrom; and, further, that said Warren be compelled to register the transfer of said shares to complainant, and issue to him a new certificate therefor. The respondent Head files answer to the bill, admitting complainant's title to this stock. The answer makes a long recitation of facts leading up to the controversy herein, from which it appears that, subsequent to the incorporation of the said Phœnix Company, an association known as the American Cattle Trust was formed, in the state of New York, for the purpose of conducting a general cattle business, by acquiring a majority of the capital stock of corporations and associations engaged in such business. This corporation was not an incorporated institution, but was simply an association of private individuals. It is alleged that on April 25, 1887, a contract was made by the respondents Head and Lawrence, and one J. C. Leary, on the one part, and the American Cattle Trust on the other, by which the former agreed to convey the stock in question to the cattle trust in consideration of a given number of certificates for shares of stock in the trust company, on the basis of a valuation of the shares of stock in the trust company at $100 per share, and taking in exchange therefor the shares of stock in the Phœnix Company at a valuation of 25 cents on the dollar. This contract appears to have been first executed by the mutual transfer of the respective certificates of shares of stock in said companies. The answer alleges, *inter alia*, that, notwithstanding the sale of said capital stock to the said American Cattle Trust, the business was thereafter to be continued, as theretofore, in the name of the Phœnix Company, and that the said Lawrence, Leary, and respondent were to continue to act as directors and managers of said company, "subject, however, to a certain control over the general management of said com-

pany by the board of trustees of the American Cattle Trust;" and, fur-: ther, that when the contract for the transfer of exchange of said shares· of stock as aforesaid was made it was understood—

"That the said shares of the capital stock in said company [the Phœnix] were to be kept and held by the said American Trust Company: that the same were not to be put on the market for sale, nor sold, nor transferred, or any part thereof, to any other person, syndicate, or corporation; that it was not contemplated, according to the terms of the articles of agreement constituting said American Cattle Trust, that said shares of the capital stock, or like shares in any other corporation, the controlling interest in which was acquired as aforesaid, should be placed on the market, or sold or disposed of in any manner, during the existence of said American Cattle Trust, but that the same should be kept and held in the hands of persons, members of said trust, or persons by them selected for that purpose, to be kept and held as evidence of the right and power of the American Cattle Trust to regulate and manage, in accordance with the general and harmonious plan applicable to and affecting all the corporations which should be members of said American Cattle Trust; and that, while it was agreed and accepted that the said American Cattle Trust, through its trustees, in the exercise of their best discretion, should purchase, sell, and exchange property from time to time for the general interest of the trust, it was not contemplated that the shares of stock, or any interest in the property, of said American Cattle Trust, should be sold to any other syndicate, corporation, or person."

It is then alleged: That after the completion of said contract for the exchange of said respective shares of stock the 1,596 shares of stock in the Phœnix Company were signed and delivered to the American Cattle Trust, and that such arrangement continued until the 9th of February, 1888, when the four certificates, of 398 shares each, delivered as aforesaid to the American Cattle Trust, were returned and canceled, and a new certificate was issued by respondent, as president, and said Leary, as secretary, for 1,596 shares. That afterwards, on the 2d of February, 1889, one Charles W. Gould, who was then chairman of the American Cattle Trust, presented said certificate for 1,596 shares, and requested· that four certificates be issued in lieu thereof,—one in the name of defendant, for 399 shares; one in the name of J. L. Brush, for a like number; and one in the name of said Lawrence, for a like number; and the other in the name of said Gould, for the remaining shares,—which certificates were then issued, signed by respondent, as president, and by the respondent Warren, as secretary, who had in the mean time succeeded to such office. That by understanding and agreement between said Gould, representing the American Cattle Trust, and this respondent, the said four certificates were signed in blank, to be forwarded to M. C. McGhee, the treasurer of said American Cattle Trust, at New York, with the distinct agreement between said Gould and the respondent that the certificates were to remain in the possession of said treasurer. And, again, it was agreed and understood that at the approaching annual election of directors, which was agreed by all concerned should be held at Denver, Col., the said Lawrence, Brush, Gould, and this respondent should be elected directors. The answer then makes this further allegation:

"Defendant further avers that the complainant George II. Gould is a brother of the said Charles W. Gould, chairman of the said American Cattle Trust; that the said George H. Gould was and is cognizant generally of all affairs, purposes, and operations of the said American Cattle Trust, and of the plans, purposes, and schemes of the said Charles W. Gould, McGhee, and others now controlling the affairs of said American Cattle Trust, and that, combining, confederating, and conspiring with them, he entered into an arrangement with them whereby the said shares of stock were to be indorsed and delivered to him, apparently and professedly, for value, but really without any consideration, so as to enable the said complainant, apparently as a *bona fide* purchaser, to acquire ownership and control of the said Phœnix Farm & Ranch Company; the real purpose of said arrangement, however, being that the said Charles W. Gould, president, and the said McGhee, treasurer, and other persons connected with said American Cattle Trust, should in his name, and through him, obtain the direct and exclusive control of said Phœnix Farm & Ranch Company, to the exclusion of defendant, the said Lawrence, and all other persons interested therein."

It appears from the answer that the said trust association has acquired the controlling interest in a large number of cattle companies scattered over the states of Texas and Colorado, and the territory of New Mexico, and that it has issued therefor certificates of stock aggregating about $15,-000,000. Exceptions are taken to the greater part of this answer, for impertinence and immateriality. By stipulation of counsel, the articles of association of the American Cattle Trust are to be taken as a part of the answer, or, at all events, to be considered by the court in the determination of the questions raised.

*Rogers & Cuthbert*, for complainant.

*Hugh Butler*, for respondents.

PHILIPS, J., (*after stating the facts as above.*) I do not feel called upon, in the determination of the questions raised by the exceptions, to pass upon the question whether or not the real object and inspiration of the American Cattle Trust was to form such a combination against the freedom of trade and competition as to subject it to the disability of being contrary to public policy. The trust company, as such, is not before the court; and counsel for defendant declines to urge such objection against the character of the trust.

The first question of importance arising on the answer is, did the the American Cattle Trust, or the trustees thereof, have the power to transfer, by sale or otherwise, the shares of stock in question to the complainant? Exactly how the complainant acquired possession of this stock is not disclosed by the bill; and, taking the answer in its entirety, it is to be inferred from its statements that the complainant must have obtained them by the president or the treasurer, McGhee, of the cattle trust, filling up the blanks in the four certificates mentioned in the answer with the name of the complainant, and then delivering them to him. And, referring back to the averments in the bill, the complainant claims to have obtained them as a purchaser for good and valuable consideration; and, for the purposes of this exception, we may so first consider him. On the hearing of the application for a temporary injunction, it

was held by Judge HALLETT that, under the constituting instrument of the American Cattle Trust, it was not within the general scheme and purpose of the trust that the trustees should, upon the acquisition of the shares of stock of any corporation, immediately transfer them by sale to a third party. *Gould* v. *Head*, 38 Fed. Rep. 886. If this be correct, it would, upon the complainant's theory of his right, place him *hors de combat* on his own chosen field. This leads to an examination of the articles of association of the American Cattle Trust. The second paragraph thereof is as follows:

"The general object contemplated by the parties who unite in the establishment of this trust is to encourage, develop, and secure improved methods and economies in the production, transportation, distribution, handling, and sale of cattle, sheep, hogs, and other animals, and of the food and other products produced or manufactured from them, or any or all of them, in the United States or elsewhere, and to transact any and all other business incident thereto, growing out of or connected therewith, or with any or all of them."

The fifth paragraph sets out the method by which the general objects of the association are to be attained:

"The method adopted by the parties hereto, and the trustees acting under the trust agreement, for accomplishing the objects hereinbefore stated, is the acquisition, by purchase, exchange, or otherwise, and the holding, management, and disposition, of shares of the capital stock of companies, corporations, and joint-stock associations organized for any of the purposes hereinbefore named in the second article of this agreement, in the states and territories of the United States, and in the District of· Columbia, as well as in any other country,"

Looking at these provisions alone, there is strong ground of doubt as to whether it would be within the scheme of the trust that the trustees should transfer by sale the stock acquired to a third party. Such power, unquestionably, should appear in express terms, especially if its exercise is likely to be followed by such results as suggested themselves to the mind of Judge HALLETT. The only term from which such power can be deduced, looking at paragraph 5 alone, is the following: "And disposition of shares of the capital stock of companies, corporations," etc. The term "disposition" has so many applications, in its mere dictionary definition, which in the main are consistent with the more general objects declared in the second paragraph, that it might well be said that meaning should be given to it, if possible, which would not pervert the general declared object of the association, nor lead to results of injustice to the interests of all concerned. In such juncture, the court might well say that the term "disposition" should be restricted to its more primitive and general import, which does not necessarily imply a barter, sale, or alienation. The greatest embarrassment, however, to my mind, arises on the language of subsequent paragraphs. The sixth section provides, *inter alia*, that—

"All of the shares of stock, bonds, cash, and other property or contracts for the same, rights, etc., or any matter or thing of value whatsoever, coming into the possession or control of the trustees, or to which they may be or

become entitled, shall be vested in, held, and controlled by the trustees as a whole, and shall not be alienated or parted with, except upon the authorization, and with the approval, of the board of trustees."

The primary meaning of the word "alienate" is "to convey or transfer to another, as title, property, or right." The necessary implication from this is that it was in the contemplation of the originators of the association, and also in the mind of the framers of the articles, that it came within the power of the trustees to alienate shares of stock held by the trustees, as it is expressly declared that they shall not alienate or part with the same, "except upon the authorization, and with the approval, of the board of trustees."

Then the twelfth paragraph, which defines and declares "the powers and duties of the board of trustees," is as follows: "To acquire, receive, hold, and dispose of the title to shares of the capital stock of companies, corporations, and joint-stock associations, organized or engaged in any of the lines or branches of business hereinabove described, or in any business relating to or connected therewith, or in any degree pertaining or auxiliary thereto." It is among the recognized canons of construction that words and phrases shall be taken in their plain, ordinary, and usual sense. Particular words and phrases are to be taken and understood in their obvious meaning and common acceptation; and if they have acquired, among certain classes of persons or tradesmen, any different or special signification, they are to be so applied by the court. The term "disposed of," in its dictionary definition, has among its meanings that of "bargain," "alienation," "passing from one into the control of another," "parting with." Webst. Dict. *b.* Of course, the import of this term may be so limited by its context and its cognates as not to extend to a conveyance or sale of property. The statutes concerning the grounds of attachment in civil actions, as set out in many of the statutes, afford an illustration. It has been held by the supreme court of Missouri, in *Bullene* v. *Smith,* 73 Mo. 151–161, that the subdivision "that said debtor has concealed, removed, or disposed of, or is about to conceal, remove, or dispose of, his property," does not embrace and cover the case of a fraudulent conveyance of property, for the reason that a preceding subdivision of the section expressly names fraudulent conveyances, and, as every part of this section is to be presumed to cover a different mode of disposition or act, the term "dispose of" is intended "to cover all such alienations of property as may be made in ways not otherwise pointed out in the statutes; for example, such as pledges, gifts, pawns, bailments, and such other transfers and alienations as may be effected by mere delivery, and without the use of any writing, assignment, or conveyance." But it is quite evident from this opinion that, but for such expressed employment of the word "conveyance" in a preceding subdivision, there would have been no question but that the term "dispose of" would have comprehended an alienation by conveyance. If a power of attorney, or instrument creating an agency, declared that such attorney or agent, to whom was intrusted certain shares or other property, had power to dispose of the title thereto, could it be reasonably questioned that the power was expressly

given to alienate—to sell—such shares or property? The *jus dispo-nendi*, in the construction of wills and deeds, has been held to arise on terms of like import. The power to hold such shares, and, of consequence, to manage and control them, is expressly given; and this is followed and supplemented by the power to "dispose of the title." Regard must be had to all the words and terms of the instrument creating and setting forth the powers and duties of such trustees. Such meaning must be given to them, if possible, as will give effect to all its parts; for the presumption must be indulged that in the construction of the instrument the framers carefully weighed each and every term employed. So, where different words are employed in defining the powers, with different import, enlarging or multiplying the functions of the trustees, each term, *in pari materia*, must be allowed its full import and office.

Looking at this twelfth paragraph, we find that the power to acquire is given; then the power to receive and to hold. Each of these indisputably possesses a distinct meaning and office. Then follows the power to dispose of the title,—another and further power. Some force and effect must be given to it, and its office can no more be suppressed or denied than that of its neighbors in the context. In looking further down this twelfth paragraph, we have another instance of the employment of this term, "dispose of," indicating the fact that the draughts-men employed it in the sense of alienation and complete conversion. Respecting the dividends and profits arising from the trust, power is given "to invest, dispose of, and reinvest the same." As the power to invest is first stated, followed by the power to dispose of, the term "reinvest," it does seem to my mind, obviously has reference to the proceeds of the thing disposed of, which necessarily implies that there had been an exchange, by conversion, into some other form by the disposal. I make no question of the correctness of the rule that where, for example, the provisions of the law are inconsistent and contradictory to each other, or a literal construction of a single sentence or section would conflict with every other, and with the entire scope and manifest intent of the act, it is the duty of the court, if it be possible, to harmonize the various parts with each other, and that to effect this it may be necessary to depart from a literal construction of one or more sections. But, where a statute or written instrument can be construed consistently with a literal meaning of the words used, the court will not give it another construction by nullifying or disregarding one of its express terms. *Hicks* v. *Jamison*, 10 Mo. App. 35. There does not appear, to my mind, such palpable conflict and incompatibility between the general declared object of the trust, and the power of disposal lodged in the trustees, as to justify the elimination of the term "dispose of the title." The trust agreement throughout shows that the most plenary discretion is conferred on the trustees as to the manner of managing and applying the properties of the concern. If, in the exercise of their best judgment, in good faith, it was deemed wisest, for the interests of all concerned, to sell the shares in any one of the cattle companies, and reinvest the proceeds or distribute the dividends, rather than depend upon the profits to be de-

rived from a successful management of the cattle, why should they not exercise the discretion? What injury could necessarily be sustained by the respondent, as a stockholder in the general trust property? His interest would simply be in the proceeds of the sale of the shares, just as it would be in the proceeds of the sale of the cattle if the trust company had retained the shares of stock in the corporation. Of course, if such sale of shares should be made in bad faith, corruptly, in violation of the trustees' obligation, the respondent, as any other stockholder, would have the right and the ready remedy to call the trustees to an account, or to restrain them, as for any other breach of trust duty or threatened injury. It appears from the trust agreement that the respondent signed the same as one of the original parties to its organization. He therefore knew what the powers of the trustees were when he entered into the compact for the transfer of his stock. Certainly, as a stockholder in the Phœnix Cattle Company, it was his right and privilege, which no one could gainsay, to dispose at pleasure, by gift or sale, of his certificates of stock therein. "The owner may sell and assign such shares like any other personal property. The right of alienation is an incident of such property, as well as any other; and a by-law of the corporation prohibiting alienation, or placing restraints thereon, is void." Wood's Field, Corp. § 98; *Moore* v. *Bank*, 52 Mo. 377. These certificates, in the progress of commercial law, have become the basis of commercial transactions in our states; and, "although neither in form or character negotiable paper, they approximate to it as nearly as practicable." *Bank* v. *Lanier*, 11 Wall. 377. The respondent got exactly what he contracted for, and we might well apply to him the language of the court in the case of *State* v. *Cotton-Oil Trust*, as follows:

"If, as alleged, these certificates have been taken as a price or in exchange for ten million dollars of property transferred to the trust, then, whatever be their validity and effect as shares of stock, whether or not they confer on the holders the privileges of corporate stockholders, or whether or not they confer the right to participate in the carrying on of any illegal business, yet they undoubtedly do represent an interest in the property referred to, and as such have a legal and real value; and we cannot understand how such property rights can be placed *hors de commerce* by an injunction."

It results that the exception to so much of the answer as in effect pleads that the trustees of the American Cattle Trust had no power to transfer the stock in question to complainant is sustained.

That part of the answer which pleads an understanding between respondent and the representative of the American Cattle Trust to the effect that the certificates transferred to it by respondent should be held by it, and not transferred to any third party, is excepted to on the grounds that it attempts to vary, restrict, and add to the terms of the written contract of sale between respondent and the trust company, and is without consideration to support it. The answer had in the preceding part set out the terms and specifications of this contract, but does not aver that the contract was in writing. Of course, if it was reduced to writing, the presumption is that it contained all that was

agreed upon and understood by both parties up to and at the time of its execution. This would be equally true respecting a parol or verbal contract at the time the minds of the parties met as to its terms and conditions. This alleged understanding is not pleaded as a collateral undertaking, not expressed in the stipulation, and withheld, for any certain reason; but it is quite clear that it came into being after the contract of sale was made, for it is alleged, in effect, that it was understood "when the contract between himself and the said Lawrence and Leavens was completed." It, then, being a subsequent agreement, it is obnoxious to the objection that no consideration is alleged to support it; and the exception thereto is sustained.

I am of the opinion, however, that the last matter of defense pleaded in the answer, which is set out in the foregoing statement, contains matters of substance, which ought to be investigated before the court should order a certificate to be issued in the name of the complainant, as prayed for. If he has paid no value for the possession of the stock claimed by him, and he is lending himself to a conspiracy to enable the parties named to hold and control the properties of the Phœnix Cattle Company, with a view of wrecking it, and thereby diminishing to that extent the value of respondent's stock in the American Cattle Trust, the complainant should have no standing in a court of equity to assist him to a position the better to accomplish the contemplated wrong. If he is an innocent purchaser for value, and in good faith, he can show it; and if his claim is merely simulated, and he has acquired possession, as the agent and instrument of the trust company, to enable them to perpetrate a fraud or wrong upon the rights of the respondent as a stockholder, it seems to me that this court ought not to compel the respondent, as president of the Phœnix Cattle Company, to execute to him a new certificate of stock, but the court should leave him where his own wrong has placed him. The exception to this part of the answer is therefore overruled.

The demurrer of the respondent Warren, the secretary of the Phœnix Cattle Company, I do not think is well taken. The act to be performed by him is simply ministerial. *In re Klaus*, 29 N. W. Rep. 582. And I concur with what I am advised was the ruling of Judge HALLETT in this case: that the corporation is not a necessary party to this action. The demurrer is accordingly overruled.

There may be other matters and things stated in the answer obnoxious to the objection of immateriality, and the like, viewed as independent, substantive averments. But, as they are blended with the recitation of historical facts, showing how the respondent parted with his stock, and how the complainant obtained its possession, they are at least harmless defects; and it could subserve no useful purpose to undertake to separate and eliminate them.