SENN, Appellant, v. UNION PREMIUM AND MERCANTILE COMPANY, Respondent.

St. Louis Court of Appeals, January 16, 1906.

1. **CORPORATIONS: Stockholders: Transfer of Stock.** An incident to the ownership of shares of stock in a corporation is the right to freely sell and dispose of them, and ordinarily an assignee of shares of stock has the right to have them transferred into his name on the books of the company.

2. ———: ———: ———: **Motive of Transfer.** Generally the motive for which shares of stock are assigned, whether they be sold or given away, does not affect the right of the assignee to have the transfer registered on the books of the company, provided he is a genuine purchaser or donee.

3. ———: ———: ———: ———. But where shares of stock are transferred to be held in secret trust for the assignor and for some iniquitous purpose, such as the purpose of wrecking the corporation, a court of equity may refuse to compel the registration of the transfer on the books of the company.

4. ———: ———: ———: ———. Where a stockholder in a corporation signed an agreement for the consolidation of that corporation with another on certain terms, which agreement was signed by all the stockholders of both corporations, but afterwards refused to be bound by the agreement and transferred a portion of his stock to another, in an action by that other to compel a registration of the transfer upon the books of the company, where both assignor and assignee testified that the transfer was in good faith and for valuable consideration, though other circumstances indicated that it was for the purpose of defeating the said agreement, and where it was shown that the assignee knew of the agreement and agreed to be bound by it, the court will order the transfer of the stock with the proviso that the assignee shall be bound by the contract of consolidation to the same extent as the assignor.

Appeal from St. Louis City Circuit Court.—*Hon. O'Neill Ryan,* Judge.

REVERSED AND REMANDED (*with directions*).

*G. Wm. Senn* and *Rassieur, Schnurmacher & Rassieur* for appellant.

(1)    The right to transfer his shares is incident to every shareholder, and the correlative obligation of the corporation is to register such transfer. 2 Thompson on Private Corps., sec. 2301; Helliwell on Stock and Stockholders, secs. 179, 180, 186; 2 Cook on Corps., secs. 385, 388. (2)    Nor has the corporation any right to refuse such transfer where the motive of the transferee is not, in itself, unlawful (2 Thompson on Private Corps., secs. 2300, 2303), even, e. g., although the transfer was made for the express and sole purpose of qualifying the transferee to vote and become a director (Helliwell on Stock and Stockholders, sec. 165), nor, e. g., upon the ground that the control of the stock by the assignee thereof will prove injurious to the interests of the corporation; nor, although the transfer was evidently made for the purpose of securing to the transferee and his friends control of the corporation. In re Klaus, 67 Wis. 401; Miller vs. Houston, 55 Fed. 366; State ex rel. v.

Smith, 48 Vt. 266; 2 Cook on Corps., sec. 386; Barr v. Cubbage, 52 Mo. 404; Buford v. Keokuk, 3 Mo. App. 159. (3) And the unlawful notice must be affirmatively proved, expressly or by circumstantial evidence, yet mere suspicion or conjecture is not sufficient to establish it, and the burden of proving it is on the party alleging it.

*Wm. A. Kinnerk* for respondents.

STATEMENT.—The consolidation contract referred to in the opinion was as follows:

"Memorandum of joint agreement between the stockholders of the Union Premium and Mercantile Company and the stockholders of the Charles Rost Furniture and Premium Company, for the purpose of consolidating the business of both companies:

"We, the undersigned, stockholders aforesaid, for and in consideration of the mutual promises, stipulations and agreements herein contained, do hereby stipulate and agree with each other as follows:

"First. Each and every stockholder of either company, or both, signing this agreement shall be bound by the same. But this agreement shall be effective only when sufficient of the stock of both companies, as required by the laws of the State of Missouri, shall have been subscribed to effect the purpose intended hereby.

"Second. A corporation shall be organized by a majority of the stockholders in interest who subscribe hereto, under the laws of Missouri, which company shall be styled Rost Union Premium Company, or other suitable name, which company shall have a capital stock of thirty-five thousand dollars, being the combined capital of the two existing companies, which capital stock is to be divided into thirty-five thousand shares of the par value of one dollar per share, and shall be fully-paid stock by taking over as going concerns the assets of the present existing companies.

"Third. Each stockholder shall deposit the shares standing in his name on the books of the company with F. A. Trebbe, which stock shall be indorsed in blank, and shall receive in exchange for such stock the same number of shares in the new company as is now held by him in both of the existing companies or in either company.

"Fourth. The new company to be formed shall take over all the assets of both of the existing companies and shall assume all of the liabilities of both.

"Fifth. All terms of employment held by any subscriber hereto in either of the existing companies, whether by election or resolution, or appointment, or in any other manner, shall immediately upon the organization of the new company herein mentioned, cease and determine.

"Sixth. Charles Rost, a stockholder in the Charles Rost Furniture and Premium Company, and Arnold L. DeVoigne, a stockholder in the Union Premium and Mercantile Company, hereby agree with the other subscribers to this agreement (and this is one of the considerations inducing the other subscribers hereto to enter into this agreement), that they will each execute and deliver to the said new company an agreement in words and figures as follows, to-wit:

" 'I will not, either directly or indirectly, for the period of five years from the organization of this company, engage, within a radius of fifty miles of the territorial limits of the city of St. Louis, Missouri, in the business now or heretofore carried on by said Charles Rost Furniture and Premium Company, and the Union Premium and Mercantile Company or any other business which this company may engage in, nor shall I, either directly or indirectly, in my own name or otherwise, hold any stock in or be interested in any corporation, firm or business of like character as said Charles Rost Furniture and Premium Company, and said Union Premium and Mercantile Company, or which this com-

pany may engage in, nor shall I hold any office or employment of any kind whatsoever in any business of like character. And for each and every day that I shall violate this agreement, I shall forfeit and pay to this company, its successors or assigns, the sum of fifty dollars per day by way of liquidated damages, and not as a penalty.'

"In testimony whereof, the said parties have hereto subscribed their names at the city of St. Louis, Missouri, this 1st day of September, 1904.

"JOSEPH LOEWENBERG,

"6622 shares.

"A. L. DEVOIGNE,

"12,120 shares."

Then follow the signatures of the other stockholders in the two companies to be consolidated.

Kinnerk's letter, written as defendant's attorney, and refusing to transfer shares of stock to plaintiff, reads:

"Mr. G. Wm. Senn, Attorney at Law, Granite Building, City.

"Dear Sir: Referring to your demand made upon Mr. Trebbe, Secretary of the Union Premium and Mercantile Company, this morning, for the transfer of certain stock in said company to yourself and Joseph C. Mueller, I beg to say that Arnold L. DeVoigne, who is the owner of the stock which is requested to be transferred, in conjunction with all the other stockholders of this company, and the Charles Rost Furniture and Premium Company, on September 1, 1904, entered into an agreement in writing providing for the consolidation of these two companies.

"Such being the case, the request that this stock be transferred to yourself and Mr. Mueller can only be complied with provided you and Mr. Mueller agree in writing to be bound by the terms and conditions of this contract.

115 app—44

"You are welcome to see this contract at my office any time you may desire to do so. We hold stock left with Mr. Trebbe this morning awaiting an answer to this communication. In the meantime, I remain,

"Very truly yours,

"WM. A. KINNERK,

"Att'y for Union Premium and Mercantile Company and Charles Rost Furniture and Premium Company."

The document, delivered by plaintiff to defendant to signify his willingness to be bound by the consolidation contract, reads:

"These presents witnesseth that the undersigned, assignee, through Arnold L. DeVoigne, of shares of stock in the Union Premium and Mercantile Company, a corporation, transferred and assigned by one U. G. Biby, accepts the transfer of such shares and new certificate therefor issued by said company with full acknowledgment and notice of the claim asserted by Joseph Loewenberg and other stockholders in said company, and in the Charles Rost Furniture and Premium Company, a corporation, under and by virtue of a contract or agreement, alleged to have been executed by said DeVoigne, for the consolidation of the aforesaid company with the Charles Rost Furniture and Premium Company, a corporation, and the organization accordingly of a new company upon such consolidation; and that the undersigned, pursuant to the foregoing, requests and accepts such transfer and new certificate subject to any rights against such transferred shares which said Loewenberg and others may have and hereafter establish pursuant to the said alleged contract.

"Witness my hand and seal this 10th day of November, 1904.

"G. WM. SENN.    (Seal)"

GOODE, J. (after stating the facts).—The petition in this case is in the nature of a bill in equity and the

relief sought is an order on the defendant corporation and its officers, to transfer ten hundred and eighty shares of stock to the plaintiff on the books of the company and issue to him a certificate for the shares. Prior to their alleged purchase by the plaintiff, these shares stood on the books in the name of U. G. Biby, and he held a certificate for them; but they were actually owned by A. L. DeVoigne, from whom plaintiff asserts he purchased them about November 5, 1904. The good faith of this purchase is contested, the answer averring that plaintiff holds the shares for the benefit of DeVoigne whose property they still are, and that the sale to plaintiff was colorable and made for the purpose of evading an agreement which DeVoigne had signed. The answer further states that the defendant had agreed, before this suit was brought, to transfer the shares to plaintiff provided he would abide by and become a party to said contract. The instrument containing the contract bears the date of September 1, 1904, and was executed by all the shareholders, including DeVoigne, in the Union Premium and Mercantile Company, the defendant, and also by all the shareholders in the Charles Rost Furniture and Premium Company, a corporation engaged, like the defendant, in the furniture business. The object of the agreement was to bind the shareholders in the two companies to an arrangement for their consolidation, or merger into a new corporation intended to be organized under the name of the Rost Union Premium Company. The new organization was to have a capital stock equal to the combined stocks of the two old companies and the intention was that it should take over all their assets and assume their liabilities. There were other stipulations in the contract not relevant to the present controversy. DeVoigne signed it as the owner of 12,120 shares of stock, all in the Union Premium and Mercantile Company. The other shareholders in the two existing companies likewise pledged their full holdings to its terms. But DeVoigne swore that at

the time he signed the instrument, he made notations on it, denoting that he would not be bound by its provisions unless certain changes were made. He objected to the name "Rost" appearing in the name of the new corporation, because he was at enmity with Charles Rost. He also objected to certain persons being taken in as shareholders, and made a more or less insistent demand that a writing be executed showing an agreement to pay him a salary in the new company. DeVoigne did not swear that he noted these matters on the consolidation agreement before signing it, or that he wrote anything on it signifying that his signature was not intended to bind him; but says he told Loewenberg, the president of the defendant company, that he would be bound only in case his objections were removed. In point of fact, he put nothing on the instrument except a blue mark under the word "Rost" and a crossmark after the word "company" in the clause of the instrument providing that the new ` corporation should be styled "Rost Union Premium Company." As said, the agreement for the consolidation was executed September 1, 1904, and in a few days, the articles of association of the intended new corporation, into which the old companies were to be merged, were sent to the Secretary of State. But on September 9th, DeVoigne telegraphed that official to await a letter objecting to a certificate being issued to incorporate the new company under the name of the "Rost Union Premium Company." This telegram was followed by a letter of the same date in which the objections were stated to be that the defendant, the Union Premium and Mercantile Company, was still active and doing business and had not been consolidated with any other company; further that there was in operation a company known as the "Charles Rost Premium Company," doubtless meaning the "Charles Rost Furniture and Premium Company." Hence, it appears that nine days after he signed the agreement for the incorporation of the "Rost Union Premium Com-

pany" and the merging in it of the existing corporations DeVoigne took steps to prevent the incorporation of the new company on the ground of the existence under similar names, of the old companies. In other words, he practically repudiated his consent to the consolidation of the old companies, and attempted to prevent it, by suggesting to the Secretary of State that the proposed name of the new company was an imitation of the names of two companies already in existence, and, therefore, in contravention of the statutes (R. S. 1899, sec. 1312). This move blocked the effort to incorporate the new company, for the Secretary of State never issued a certificate of incorporation. When Loewenberg expostulated with DeVoigne about the latter's course, DeVoigne wrote a letter, under date of September 10th, in which he stated that his only objection to the incorporation of the "Rost Union Premium Company" was that the name "Rost" was put before "Union," and that if the style of the company were changed so as to read Union Premium and Rost Mercantile Company," he would sign the articles of association, and withdraw his objections on file in the office of the Secretary of State. Accordingly, articles of association were prepared with the corporate name changed to suit Devoigne; but when the paper was presented to him for his signature, he refused to sign it. In protesting to the Secretary of State and in all his other doings in reference to the proposed consolidation, DeVoigne was represented by Rassieur & Rassieur, a firm of attorneys of which the plaintiff Senn is a member. In truth, Senn was the active attorney for DeVoigne. It should be stated that there stood in De-Voigne's name on the books of the Union Premium & Mercantile Company 9,620 shares of stock; but he really owned 12,120 shares. The 1,080 shares which stood in Biby's name belonged to him and also 1,320 shares covered by stock certificate No. 15, and one hundred shares covered by stock certificate No. 17. The shares embraced in those two certificates were nominally held by other

persons whose names are not disclosed. While the attempt to create the new corporation and merge the old ones in it, remained in abeyance on account of De-Voigne's opposition, the latter sold to Senn, as the petition avers, the 1,080 shares of stock held by Biby. The stock certificate was assigned by Biby to Senn, and he and DeVoigne then went to the office of the defendant company, presented the certificate and demanded that the shares be transferred from Biby's name to Senn's on the books, and a new certificate issued to Senn. At the same time, DeVoigne demanded that the 1,320 shares covered by certificate No. 15 be put in his (DeVoigne's) name on the books and that the one hundred shares evidenced by certificate No. 17 be put in the name of Joseph C. Mueller. The secretary said the matter would be referred to Mr. Kinnerk, the attorney for the company. This was done and on November 7th, Kinnerk wrote Senn a letter saying that DeVoigne had signed the consolidation agreement above referred to, and that shares could be transferred from his name into the names of Senn and Mueller, only on the condition that the transferees would agree to be bound by the terms and conditions of the consolidation contract, which they might see at any time in Kinnerk's office. Senn called at Kinnerk's office once or twice to see the contract, but was never shown the original. Instead, a copy was exhibited to him. The copy was like the original in all respects except the blue markings adjacent to the words "Rost" and "Company." Kinnerk swore that he did not have the original when Senn called for it; but the drift of the latter's testimony is that Kinnerk had it but would not exhibit it. The purport of Senn's statement, in this connection, is that he understood the original would show that DeVoigne was not absolutely, but only conditionally, bound, and he desired to examine the instrument to ascertain whether this was true. In the course of his efforts to have the shares transferred into his name on the books of the company, Senn delivered to

Kinnerk, as the company's attorney, the writing copied in the statement wherein he accepted, in a way, the consolidation agreement. Kinnerk appears to have been satisfied with the writing, and to have deemed it sufficient to bind Senn, as assignee of the stock, by the terms of the consolidation contract. But Loewenberg, president of defendant company, still refused to let the stock be transferred to Senn unless the latter would sign his own name to the contract. With affairs in this posture, the present action was instituted.

One of the incidents pertaining to the ownership of shares of stock in an incorporated company is the right to freely sell and dispose of them. This right is rather strictly maintained by the courts against restrictions imposed in the by-laws of corporations; though reasonable by-laws to regulate the mode of transferring shares of stock are not ignored. [The Chouteau Spring Co. v. Harris, 20 Mo. 382; Moore v. Bank of Commerce, 52 Mo. 377; Helliwell, Stock and Stockholders, sec. 164.] An assignee of shares ordinarily has the right to have them transferred into his name on the books of the company, and a new certificate issued to him. [Merchants' Nat. Bank v. Richards, 6 Mo. App. 454, 74 Mo. 77; Spreckels v. Bank, 113 Calif. 272; Johnston v. Laflin, 103 U. S. 800.] In behalf of all parties concerned, it is desirable that the actual owners of the stock of a company should be shown to be the owners on the books. Officers can thereby readily ascertain to whom the company's dividends should be paid and notices of corporate meetings given; the business public, any member of which may have occasion to levy process on the shares of a member, may more conveniently learn who owns the stock and the owner himself is given his full rights to vote for directors and receive dividends and is not relieved from the liabilities of a shareholder. The defense to the present action is that Senn is not a bonafide owner of the shares, but holds for DeVoigne pursuant to an assignment made to relieve the shares from

the obligation of the consolidation agreement, to which they are subject while in DeVoigne's name. Much stress is laid on the circumstance that Senn bought the shares at a price far below their real value and has never paid the nominal price agreed to be paid. The par value of the shares is one dollar each, or of the whole, $1,080. But this appears to be greatly in excess of their actual value. The evidence goes to show that, a short time before the sale to Senn, DeVoigne had bought 2,500 shares for $400, or about sixteen cents a share. Senn agreed to pay between two and three cents a share for the stock he purchased, and this trifling consideration clouds the transaction with suspicion. But both DeVoigne and Senn testified that the purpose of the former was to get some one into the company who would be friendly to him. DeVoigne had holdings of more than $12,000 at par value and, therefore, was heavily interested in the company's success. The inference to be drawn from his testimony is, that the defendant's director's and officers had been managing its affairs in a way opposed to his interests and had refused to give proper recognition to his wishes and opinions as a shareholder, who owned nearly one-half of the capital stock. He said that he desired the support of Senn and Mueller; and for that reason was willing to dispose of some stock to them at so low a price. Senn did not pay the $25 but both he and DeVoigne testified that this was because DeVoigne was indebted to him for attorney's fees in a larger amount. In our judgment, if Senn paid nothing for the stock his title would not necessarily fail. The inadequate consideration is merely a circumstance to support the theory that no actual sale occurred. DeVoigne had a right to give him the shares, and he would be none the less the owner if they were assigned to him in good faith, as a gift, and none the less entitled to have them put in his name on the books. Some facts we have related show that DeVoigne failed to live up to his

agreement for the consolidation of the two companies, and, instead, did what he could to frustrate it. Possibly the purpose of the assignment of the shares to Senn was to enable the latter to assist in still further obstructing the proposed merger. But this is not alleged as a defense and is positively denied by both the parties to the assignment. The defense set up in the answer is that Senn is no true owner of the stock and that the shares are subject to the agreement DeVoigne signed. There is no averment that the purpose of the transfer was to introduce Senn into the defendant company as a member, in order that he might oppose the consolidation scheme. As a general proposition, the motive for which shares of stock are assigned, does not affect the right of the assignee to acquire them and have them registered in his name, provided he is a genuine purchaser or donee, and does not take the shares to hold in secret trust for the assignor. The object may be to enable the assignee to vote for directors, or otherwise assist in maintaining the assignor in control of the corporation, or in moulding its business policy; yet, nevertheless, equity will enforce the assignee's right to registration and his other rights as a stockholder. [2 Thompson on Corporations, sec. 2303; Helliwell, sec. 165; In re Klaus, 67 Wis. 401; Helm v. Swiggett, 12 Ind. 194; State ex rel. Page v. Smith, 48 Vt. 266.] But this relief is not technical nor absolute, and circumstances occasionally surround an assignment of corporate stock which induce courts of equity, in the exercise of a conscientious discretion, to refuse to recognize the assignee as a shareholder and entitled to all the rights pertaining to that status, and even to withhold a decree against the corporation commanding that the stock be registered in his name. [2 Thomp. Corp., sec. 2431.] Where stock has been transferred, to a person to enable him, as a mere puppet of the transferrer, to institute and carry on litigation for the latter's benefit or to wreak his spite, a court of equity will not tolerate the litigation; and, it

seems likely, would decline to decree a transfer of the
shares on the company's books. [Kingman v. ˙ Railway
Co., 30 Hun 73; Robson v. Dodds, L. R. 8 Eq. 301.] An
examination of the cases dealing with this subject will
show that for the assignee to be denied recognition of
his full rights as a shareholder, it must be shown that he
is acting in behalf of another. If he is acting in his own
behalf, he is accorded recognition though his motive
may be unworthy. [Bloxam v. Railway Co., L. R. 3
Ch. 337; Forrest v. Railway Co., 40 F. & G. 126.] In
Gould v. Head, 41 Fed. 240, it was held to be a good de-
fense to a bill to compel the registration of shares, that
the shares were acquired by the complainant without
any consideration, for the purpose of enabling the com-
plainant to participate in a conspiracy, formed by third
parties, to get control of the company for the purpose of
wrecking it and thereby diminishing the value of shares
in another company with which the company to be
wrecked was affiliated in business.    The decision was
put on the ground that the defense as pleaded showed
the complainant was the agent and instrument of the
conspiring third parties.

The principles of law we have stated are to be ap-
plied to the facts of the case at bar.  In making the ap-
plication, we must remember that the right of an actual
owner of stock, whether acquired by purchase or by gift,
to have his shares registered, is, from considerations of
public policy, very jealously guarded.   To defeat the
right in a given case it ought to be shown that the pre-
tended owner of the shares is not their real owner; or
clearly shown, at least, that he is seeking the transfer
for a purpose whose accomplishment is possible and
which is so iniquitous that a court of equity will decline
to aid it.  We have found no instance wherein the court
refused to compel a transfer when the petitioner ac-
tually owned the stock, on the ground that his object
was bad, except when the object was to institute litiga-
tion for the benefit of third parties; and · no instance

wherein it was done for that reason unless Kingman v. Railway Co., 30 Hun, supra, is one. It is not altogether clear whether or not the relief asked in that case was a decree for the transfer of shares, but we think it was. In the other cases we have cited, wherein complainants were denied relief because suits had been instituted at the instigation of third parties, the complainants held the shares in their own names, and it was the litigation begun by them as shareholders that the courts held would not lie, because the suits were brought to redress no grievence of the complainants, but to assist an unworthy purpose of their confederates. Still, we apprehend that stock might be acquired for some purpose so unconscionable that equity would refuse to compel a transfer, though no litigation was contemplated. Senn swore unequivocally that he bought the shares in question as a speculation, and that he owned them free from any secret trust or arrangement with DeVoigne. The latter individual testified the same way. In the face of this testimony, we are unwilling to pronounce, on the circumstantial evidence before us, that Senn is not a bona-fide owner of the stock but the agent of DeVoigne. We think it would be rash to decide the cause on that theory; particularly as, in our judgment, Senn can be given the rights of a stockholder without jeopardizing the rights of all other shareholders interested in the consolidation agreement. Important facts regarding Senn's demanding to have the stock transferred on the books are, that he acquired it with full knowledge of DeVoigne's agreement . to which the shares stand pledged, that the defendant company shall be merged in the new company along with the Charles Rost Furniture & Premium Company, and that Senn has actually given to the defendant an agreement that he will be bound by the contract. Now, we have no doubt that if the owner of shares of stock in a company who has bound all his shares by an agreement to which the other shareholders are parties, and by which they acquire rights, assigns

his stock to a purchaser, who has knowledge of this agreement, the latter takes the stock *cum onere* and is bound by the agreement. [Johnston v. Laflin, 13 Fed. Cas. 758, 762, Case No. 7393; Trust & Savings Co. v. Lumber Co., 118 Mo. 447, 459, 24 S. W. 129.] Our opinion is that Senn is entitled to have the shares placed in his name on the company's books, but with no more power to thwart the purposes of the consolidation agreement than DeVoigne possesses. In other words, that he ought to be held strictly to the terms of that agreement, against the legality of which no contention has been made. If this is done, we do not perceive how he could obstruct the rights of those who signed the agreement any more than DeVoigne can if the stock remains in his name. It is true that the writing Senn gave, in which he agreed to be bound as fully as DeVoigne was, implies a doubt whether the latter had executed the agreement as it reads. But that is a difficulty DeVoigne can raise as easily as Senn; hence, the other signers of the agreement will be in as good a position when the shares are transferred as they are now. We know of no law by which it can be made a condition of transferring the shares, that Senn should subscribe the original agreement; and this point is emphasized by the fact that the agreement was never shown to him and beyond question, he was not bound to accede to its terms until he knew that DeVoigne had signed it in such a way as to be bound, as to which plaintiff had been put in doubt. It turned out that DeVoigne had signed it without affixing conditions, and, therefore, the other signers may insist that his shares stand bound by the terms to which he pledged them. We think the decree should order a transfer with the condition embodied in the decree that Senn shall be fully bound by the agreement.

Therefore, the judgment will be reversed and the cause remanded with the direction to enter the decree in that form in plaintiff's favor. *Bland, P. J.,* and *Nortoni, J.,* concur.