GUARANTY TRUST CO. OF NEW YORK
et al. v. MINNEAPOLIS & ST. L. R. CO.
et al. (nine appeals).

Circuit Court of Appeals, Eighth Circuit.
December 24, 1929.

Nos. 8596 to 8604.

Warren S. Carter, of St. Paul, Minn. (Davis, Polk, Wardwell, Gardiner & Reed, of New York City, Kellogg, Morgan, Chase, Carter & Headley, of St. Paul, Minn., and Edwin S. S. Sunderland and Thomas O'G. FitzGibbon, both of New York City, on the brief), for Guaranty Trust Co. of New York.

Henry V. Poor, of New York City (Larkin, Rathbone & Perry, of New York City, Frederick G. Ingersoll, of St. Paul, Minn., James L. Banks, Jr., and A. M. Lewis, both of New York City, and Charles Scott Kelly, of Chicago, Ill., on the brief), for Central Hanover Bank & Trust Co.

William Lloyd Kitchel, of New York City (Cadwalader, Wickersham & Taft, of New York City, Sanborn, Graves & Andre, of St. Paul, Minn., Paxton Blair, of New York City, William G. Graves and J. Neil Morton, both of St. Paul, Minn., and Eugene J. Conroy, of New York City, on the brief), for Perkins committee.

Frederick F. Greenman, of New York City (Cook, Nathan & Lehman, of New York City, O'Brien, Horn & Stringer, of St. Paul, Minn., and Arthur Kramer and Alfred A. Cook, both of New York City, and Thomas D. O'Brien and Edward S. Stringer, both of St. Paul, Minn., on the brief), for Bache committee.

Jesse E. Waid, of New York City (White & Case, of New York City, Kingman, Cross, Morley & Cant, of Minneapolis, Minn., Joseph M. Hartfield, of New York City, and Kenneth Taylor and Norton M. Cross, both of Minneapolis, Minn., on the briefs), for New York Trust Co., and Bennett committee.

James H. McIntosh, of New York City, and Charles W. Bunn, of St. Paul, Minn. (Doherty, Rumble, Bunn & Butler, of St. Paul, Minn., and Alexander & Green, of New York City, on the brief), for Bankers' Trust Co.

Charles W. Bunn, of St. Paul, Minn. (Dennis F. Lyons, of St. Paul, Minn., on the brief), for Northern Pacific Ry. Co. on the White Bear Branch.

Taylor, Blanc, Capron & Marsh, of New York City, and Boyesen, Otis, Brill & Faricy, of St. Paul, Minn. (Edward H. Blanc, of New York City, and James C. Otis and Kenneth G. Brill, both of St. Paul, Minn., of counsel), for Farmers' Loan & Trust Co.

John Junell, of Minneapolis, Minn. (Cyril J. Curran, of New York City, and Junell, Oakley, Driscoll & Fletcher, of Minneapolis, Minn., on the brief), for interveners Hawley committee.

John Lord O'Brian, Asst. Atty. Gen., Elmer B. Collins, Sp. Asst. Atty. Gen., and Lewis L. Drill, U. S. Atty., of St. Paul, Minn., filed motion on behalf of the United States to dismiss the petition of the Hawley committee, interveners, and reply brief to the brief of the Hawley committee, interveners.

Before STONE, KENYON, and GARDNER, Circuit Judges.

GARDNER, Circuit Judge. In this case nine appeals have been taken from a consolidated decree of foreclosure and sale entered January 8, 1929, adjudging, among other things, the foreclosure of six railroad mortgages known in this record as (1) the Minneapolis & St. Louis first consolidated mortgage, dated November 2, 1894; (2) the Minneapolis & St. Louis first and refunding mortgage, dated March 1, 1899; (3) the Iowa Central first mortgage, dated August 1, 1888; (4) the Iowa Central first and refunding mortgage, dated March 1, 1901; (5) the Des Moines & Ft. Dodge first mortgage, dated January 1, 1905; and (6) the refunding and extension mortgage, dated January 1, 1912.

Supplemental decree was entered April 1, 1929, determining the priorities between the claims of the Northern Pacific Railway Company and a mortgage known in this record as the Merriam Junction mortgage covering the White Bear Lake line. These mortgages all cover some portion of the railroad system of the Minneapolis & St. Louis Railroad Company. A special master was appointed, who, with the consent and for the convenience of all parties concerned, made a consolidated report, so that for the purposes of trial the causes may be said to have been consolidated. To the special master's findings exceptions were filed, which, on hearing, the lower court, with certain modifications and amendments, approved and adopted, and filed a written opinion reflecting his views on the issues involved. This opinion will be found reported in 33 F.(2d) 512. In this court all the parties are as to some issues appellants, and as

to others appellees. There is, however, no controversy as to the validity of each of the six mortgages, the particular lines of railway and other real estate covered by each, the defaults occurring under each mortgage, the several amounts due thereunder, and the conclusion that there should be sales of the mortgaged property under each of the mortgage foreclosures.

The main controversy arises as to the proper allocation of equipment to each of the six mortgages involved. A brief statement of the history of this railroad, which has been "fearfully and wonderfully made," will be helpful to an understanding of the issues, and will be found in the opinion of the lower court, 33 F.(2d) 512, supra, to which reference is made.

The following tabulated statement shows the mortgages covering various portions of the railroad property, the mileage covered, the bonds authorized, and the amount of bonds actually issued:

| Mortgages. | Mileage Covered. | Amount Authorized. | Amount Issued. |
|---|---|---|---|
| Merriam Junction and Albert Lea, February 1, 1877 | 117 | $ 1,100,000 | $ 1,100,000 |
| Minneapolis & St. Louis first consolidated, November 2, 1894 | 368 | 10,000,000 | 5,282,000 |
| Minneapolis & St. Louis first and refunding, March 1, 1899 | 633 | 25,000,000 | 13,244,000 |
| Iowa Central first mortgage, August 1, 1888 | 503 | 7,650,000 | 7,650,000 |
| Iowa Central first and refunding March 1, 1901 | 539 | 25,000,000 | 7,156,000 |
| Des Moines & Ft. Dodge first mortgage, January 1, 1905 | 139 | 3,072,000 | 3,072,000 |
| Refunding and extension mortgage, January 1, 1912 | 2090 | 75,000,000 | 8,985,000 |

The Minneapolis & St. Louis No. 5 has been in the hands of a receiver since July 26, 1923. As stated by the lower court in its opinion: "All of the above-mentioned mortgages now in foreclosure covered equipment in addition to the lines of railway specified. In some instances, the equipment was specifically identified; in others, it was covered by general language. As new equipment was purchased from time to time, it was used indiscriminately on the railway system wherever it was needed. Much of the equipment was purchased by the common method of equipment trusts, and in numerous instances the equipment trust certificates were taken up and paid out of money derived directly or indirectly from the sale of bonds under some one of the several mortgages. In view of this procedure, it was a natural consequence that the trustees under the several mortgages, in foreclosing the mortgages, have found it no easy task to identify the equipment belonging to each of the several mortgages."

In addition to the question as to the extent to which equipment, and particularly after-acquired equipment, should be allocated to the various mortgages, there is presented the question as to what mortgage liens cover the Keithsburg Bridge, and a separate controversy as to the effect of the acquisition by the Northern Pacific Railway Company of the White Bear Lake line, approximately 15 miles in length, extending from Minneapolis to White Bear Lake Junction. The Merriam Junction mortgage, referred to in the record, is not being foreclosed, and, with the exception of its rights in the White Bear Lake line, it is not concerned with any of these questions.

A solution of the several questions presented necessitates a consideration of the after-acquired property clauses claimed to be contained in the several mortgages. There is no controversy but that a mortgage may be so drawn as to include after-acquired property. Central Trust Co. v. Kneeland, 138 U. S. 414, 11 S. Ct. 357, 34 L. Ed. 1014; Pennock v. Coe, 23 How. 117, 16 L. Ed. 436; Stockyards Loan Co. v. Nichols (C. C. A.) 243 F. 511, 514; Guaranty Co. v. Atlantic Coast Elec. R. Co. (C. C. A.) 138 F. 517; Coopers v. Wolf, 15 Ohio St. 523; Williamson v. N. J. So. R. Co., 25 N. J. Eq. 13; Nichols v. Mase, 94 N. Y. 160.

To entitle the mortgage to be so construed it must clearly appear from its face that it was the intention of the parties to pledge property thereafter to be acquired, and in the absence of words or phrases clearly and unmistakably indicating such intention the doubt should be resolved against such intention. To cover after-acquired property a mortgage should contain either words of futurity, or the language should be such as clearly to show an intention to cover such property. Pennock v. Coe, 23 How. 117, 16 L. Ed. 436; Louisville Trust Co. v. Cincinnati Inclined-Plane R. Co. (C. C.) 91 F. 699; Elijah Smith v. McCullough, 104 U. S. 25, 26 L. Ed. 637; Maxwell v. Wilmington Dental Mfg. Co. (C. C.) 77 F. 938; St. Joseph R.

Co. v. Smith, 170 Mo. 327, 70 S. W. 700; 41 C. J. 373; 4 Thompson on Corporations (3d Ed.) pp. 228, 229; 5 Cook on Corporations (8th Ed.) p. 3849; Hickson Lbr. Co. v. Gay Lbr. Co., 150 N. C. 282, 63 S. E. 1045, 21 L. R. A, (N. S.) 843; Brainerd et al. v. Peck, 34 Vt. 496; City of Bath v. Miller, 53 Me. 308. As applied to railroad property, in order that after-acquired property may be embraced in a mortgage, describing such property in general terms, the property must be such in character as appertains or is appurtenant to the road, and is necessary to the enjoyment of the franchise or operation of the road, and, if it is not such property, then there must be a specific description of it in the mortgage.

These general rules of construction are not seriously questioned by counsel, but the controversy arises as to their application to the clauses contained in the various mortgages. It is therefore necessary to consider these provisions under which it is claimed that liens attached to the property acquired, either by the mortgagor or its successor in interest, subsequent to their execution.

### The Minneapolis & St. Louis First Consolidated Mortgage.

The special master and the trial judge both held that the Minneapolis & St. Louis first consolidated mortgage contained no after-acquired property clauses, and this holding is vigorously assailed. We concur in the views of the lower court on this question, and it would serve no useful purpose to repeat here the reasons supporting this ruling. They are fully stated in the opinion of the lower court. A perusal of the language contained in the covenants of this mortgage convinces that no one of them covers after-acquired property, nor do all of these covenants, considered together, evince an intention to cover such property.

### Minneapolis & St. Louis First and Refunding Mortgage.

The special master and the trial judge both found that this mortgage contained an after-acquired property clause conveying equipment, and this holding we think cannot be seriously contested. The controlling clauses of the mortgage are set out in the opinion of the lower court and need not be repeated here.

The lower court held, however, that the after-acquired property clause was terminated by what is referred to in the record as the closure agreement of 1912, which was entered into by the Minneapolis & St. Louis No. 4, the Central Trust Company of New York, trustee under the first and refunding mortgage, and the Guaranty Trust Company, trustee under the refunding and extension mortgage. This agreement recites the existence of the first and refunding mortgage, and that the Minneapolis & St. Louis No. 4 is about to execute the refunding and extension mortgage; that Minneapolis & St. Louis No. 4 has covenanted in the refunding and extension mortgage that it would not permit any further issue of bonds under the first and refunding mortgage. With respect to the successors to Minneapolis & St. Louis No. 4, the mortgagor company, the first and refunding mortgage contains the following provisions.

"Section 1. All the covenants, stipulations, promises and agreements in this indenture contained, by or in behalf of the railroad company, shall bind its successors and assigns, whether so expressed or not.

"Section 2. Nothing contained in this indenture, or in any bond hereby secured, shall prevent any consolidation or merger of the railroad company with any other corporation, or any conveyance and transfer, subject to the continuing lien of this indenture, and to all the provisions thereof, of all the mortgaged premises as an entirety to a railroad corporation at that time existing under and by virtue of the laws of the United States or of any state or states, and entitled to acquire the same: Provided, however, that such consolidation, merger or sale shall not impair the lien and security of this indenture, or any of the rights or powers of the trustee or of the bondholders hereunder, and that, upon any such consolidation, merger or sale, the due and punctual payment of the principal and interest of all of said bonds according to their tenor, and the due and punctual performance and observance of all the covenants and conditions of this indenture, shall be assumed by the corporation formed by such consolidation or merger, or purchasing as aforesaid.

"Section 3. In case the railroad company, pursuant to section 2 of this article, shall be consolidated or merged with any other corporation, or shall sell, convey and transfer, subject to this indenture, all the mortgaged premises as an entirety as aforesaid, the successor corporation formed by such consolidation or into which the railroad company shall have been merged, or which shall have purchased and received a conveyance and transfer as aforesaid, upon executing, and causing to be recorded, an indenture with the trustee, satisfactory to the trustee, whereby such suc-

cessor corporation shall assume the due and punctual payment of the principal and interest of said bonds and the performance of all the covenants and conditions of this indenture, shall succeed to, and be substituted for, the railroad company, party of the first part hereto, with the same effect as if it had been named herein as such party of the first part, and such successor corporation thereupon may cause to be signed and may issue, either in its own name, or in the name of the Minneapolis & St. Louis Railroad Company, any or all of such bonds which shall not theretofore have been signed by the railroad company and certified in accordance herewith; and, upon the order of said successor corporation in lieu of the railroad company, and subject to all the terms, conditions and restrictions herein prescribed, the trustee shall certify and deliver any of such bonds which shall have been previously signed and delivered by the officers of the railroad company for certification, and any of such bonds which such successor corporation shall thereafter cause to be signed and delivered for that purpose. All the bonds so issued shall in all respects have the same legal rank and security as the bonds heretofore or thereafter issued in accordance with the terms of this indenture, as if all of said bonds had been issued at the date of the execution hereof.

"Section 4. For every purpose of this indenture, including the execution, issue and use of any and all bonds hereby secured, the terms 'railroad company' and 'the Minneapolis & St. Louis Railroad Company' and equivalent terms include and mean not only the party of the first part hereto, but also any such successor corporation. Every such successor corporation shall possess and from time to time may exercise each and every right and power hereunder of the Minneapolis & St. Louis Railroad Company, in its name or otherwise."

The closure agreement of January 1, 1912, above referred to, by which Minneapolis & St. Louis No. 4 relinquished its right to authorize and deliver first and refunding mortgage bonds in addition to the $13,244,000 principal amount then outstanding, contains the following:

"First. The railroad company waives and relinquishes its right to the authentication and delivery of any first and refunding mortgage bonds, in addition to the $13,244,000 face value of principal of said bonds now issued and outstanding as hereinbefore set forth, and covenants and agrees with the trustee and with the trust company, jointly and severally, that it will not at any time hereafter request or demand the authentication and delivery, under the said first and refunding mortgage, of any such additional bonds, and that it will not issue or suffer or permit to be issued any of such bonds; but any and all bonds not heretofore authenticated and delivered under the said first and refunding mortgage shall forthwith upon the execution and delivery of this agreement, be cancelled; the intention and purpose of their agreement being to dispose of all the bonds secured by the first and refunding mortgage of the railroad company (including the bonds which were under the terms and provisions of said mortgage to be issued only for extensions, improvements and equipment) not heretofore issued and now outstanding."

The purpose of this agreement was to close the issue of bonds under the first and refunding mortgage and to cancel the unissued bonds. Doubtless the motive for so doing was to terminate the after-acquired property clause in the mortgage, and the question is squarely presented as to whether a cancellation of the unissued bonds is tantamount to the expression "to sell or dispose" of them as provided in the granting clause of the mortgage.

We are of the view that the words "sold or disposed of," as used, contemplated a sale or disposition of the bonds in accordance with the provisions of article 2, sections 2 and 7, of the mortgage. No other method could have been in contemplation of the parties at the time of the execution of the mortgage. This purpose was not satisfied by a cremation, cancellation, or destruction of these bonds. Phelps v. Harris, 101 U. S. 370, 25 L. Ed. 855; Allen v. Hawk, 196 Ky. 607, 245 S. W. 170; Platt v. U. Pac. R. Co., 99 U. S. 48, 25 L. Ed. 424; Bullene v. Smith, 73 Mo. 151; Newcomb v. Newcomb, 12 N. Y. 603; Love v. Pamplin (C. C.) 21 F. 755; Gould v. Head (C. C.) 41 F. 240.

The holders of the bonds were not parties to this agreement of 1912. It is, however, argued that the trustee was the duly accredited representative of the bondholders, and as he joined in the execution of this instrument, they should be bound. The lower court held that the trustee under the railway mortgage, before default, was without such authority, and in this view we concur. Duncan v. Mobile & Ohio R. Co., 2 Woods, 542, Fed. Cas. No. 4137; Colo. & So. Ry. Co. v. Blair, 214 N. Y. 497, 108 N. E. 840, 842, Ann. Cas. 1916D, 1117.

In the last-cited case, the Court of Appeals of New York, among other things, says:

"But if the trustee has discretion to change or compromise the security held by it, it may exercise that discretion unwisely and improvidently, and the bondholders will have no recourse except to it. The vast sums invested in railroad bonds presumably on the faith of the security pledged would be subject to an unknown risk if a mortgage trustee could sell, change, or in any manner compromise the security except as authorized in express terms or by necessary implication."

 While it was the view of the lower court that this act of the trustee was ultra vires, the agreement was nevertheless held to be binding on the bondholders upon the ground that there was no sufficient proof in the record that the agreement was entered into without their knowledge; that there was no showing as to the time when the bondholders first learned of the agreement, even if they did not know of it at the time of its execution; that there was no showing whether these bondholders had held their holdings in 1912; and, finally that the recording of this agreement in the various counties in Minnesota, and with the secretary of state of South Dakota, besides other acts of publicity, showed laches on their behalf in asserting the alleged violation of their rights. There is no proof that the bondholders had actual knowledge of the execution of this agreement, and the circumstances of the making of the agreement are not such as to indicate a likelihood of actual notice. It was not incumbent upon the bondholders to prove that they did not have knowledge of the execution of this agreement, but, in order to bind them on this ultra vires act of the trustee, it was necessary to make proof that they had such knowledge or notice. The bondholders are not charged with constructive notice. There is no retrospective effect to a record, and a mortgagee, having once recorded his mortgage, is entitled to the protection of the registry laws, and is not required to search the record from time to time to see whether or not other conveyances have been placed upon the record. Jones on Mortgages (8th Ed.) § 651; Tiffany on Real Property (2d Ed.) § 567; Abbott v. Peek, 35 Minn. 499, 29 N. W. 194; Norton v. Met. Life Ins. Co., 74 Minn. 484, 77 N. W. 298, 539.

 The bondholders in their pleading denied knowledge of the 1912 agreement, but the decision of the lower court, in effect, imputed knowledge to them, apparently on the ground that a reasonably prudent man should have found out what was shown by the public records, or what was a matter of some notoriety.

We are of the view that such an imputation is not warranted. The agreement was made without consulting the bondholders, and without their knowledge, and, until there was a default in the payment of the interest coupons, there was nothing to arouse in any bondholder the least suspicion that the mortgage had been modified by a subsequent agreement.

 The lower court was of the view that the bondholders were guilty of laches, in that they had a cause of action upon the making of the agreement in 1912 and failed to prosecute it. This is predicated on the theory that the making of the agreement in 1912 disposed of the bonds contrary to the special purpose clause in the mortgage, and thus gave rise to a right of foreclosure. This conclusion we think is unsound, because the effect of the agreement was not, as we have already held, to dispose of the bonds, but was ineffectual for that purpose. Where a cause of action has not matured, a party cannot be charged with negligence for not having made an ineffectual attempt to institute suit. Consaul v. Cummings, 222 U. S. 262, 32 S. Ct. 83, 56 L. Ed. 192; Powell v. Bowen, 279 Mo. 280, 214 S. W. 142; 21 C. J. 238.

 Having in mind that a mortgage creditor is not chargeable with notice of the terms of subsequently recorded instruments, it would seem clear that a mortgage creditor should not be required to anticipate that his position would be affected by the conduct of subsequent incumbrancers. Equitable estoppel cannot be invoked by those who are equally as well aware of the vice in their title as the party who is claimed to have been under the duty to speak, but remains silent. As between the trustee under the refunding and extension mortgage, and the bondholders under the first and refunding mortgage, the former had much more direct knowledge of the 1912 agreement. It was a party to it, while the latter was not, and it was charged with notice of the previously recorded mortgage. It is axiomatic that "only the innocent may invoke estoppel." What is said by this court in Ill. Trust & Savings Bank v. Doud (C. C. A.) 105 F. 123, 52 L. R. A. 481, in an opinion by Judge Sanborn, is here apposite. It is there said inter alia:

"It is contended that it is inequitable for the trustee and bondholders to insist that the lien of their mortgage is superior to that of the intervener, because the Ottumwa bondholders knew that the addition to the plant and power of the mortgagor was being made, and that the intervener was loaning money

to the mortgagor to assist in paying for it. But the residents of Ottumwa owned only 58 of the bonds, while the majority of them were held by nonresidents, who knew nothing of the construction of the addition or of the loan of the intervener until after the new building was erected and the new machinery was purchased. The bondholders at Ottumwa could not, by their action, estop the trustee or the majority of the bondholders; and, if the intervener has any claim against the residents who held these 58 bonds, it is against them individually, and not against the trustee, or the mortgagees which it represents. Moreover, the Ottumwa bondholders did not advise, consent to, or request the loan from the intervener, and he was not induced to make it by any of their acts or omissions. *The mortgage which secured them was of record, and contained a covenant that the mortgagor should make no lien superior to theirs.* The intervener knew this fact, and made his loan in the face of it. The bondholders had the right to believe, and doubtless did believe, that he had advanced his money upon the credit of the mortgagor, and that he took his rights subject to the lien of the mortgage. *The facts constitute no estoppel against them from insisting upon their prior lien. There is nothing unjust or inequitable in their position,* and the fact that after the commencement of this suit they purchased the bonds of the nonresidents in no way changes the situation."

To hold, under the record in this case, that the bondholders under this mortgage are guilty of such laches as to estop them to question the validity of this closure agreement of 1912, would certainly go far to "shake the credit of railroad securities throughout the world." Duncan v. Mobile & Ohio Ry. Co., supra. We conclude that the after-acquired property clause of this mortgage survived the 1912 closure agreement. For reasons stated in other portions of this opinion, neither was this after-acquired property clause terminated by the 1916 consolidation.

### Iowa Central First Mortgage.

The special master found that this mortgage had no after-acquired property clause. The lower court reached the conclusion, from the language of the mortgage as a whole, that it was the intention of the parties that there should be a lien on after-acquired equipment owned by it and used by it to produce an income subject to the mortgage. The granting clause of this mortgage contains the following language: " * * * And also all machinery and tools now owned or which

may hereafter be owned or acquired by the mortgagor for use in connection with said railways, and all locomotives, tenders, cars and other rolling stock and equipment, and all implements, fuel, materials and supplies now owned or acquired by the mortgagor for the construction, maintenance, operation, repairing and replacing of said railways, and also all the privileges, rights and franchises connected with, and relating to the said railways and each of them, and all other corporate property, real or personal, of the mortgagor. Together with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in any wise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof; and also all the estate, right, title, interest, property, possessions claim and demand whatsoever, as well in law as in equity, of the mortgagor of, in, and to the above-described premises, and every part and parcel thereof with the appurtenances."

The fourth paragraph of the mortgage is as follows: "IV. The personal property and chattels hereby conveyed, or intended so to be, shall be real estate for all the purposes of this indenture and shall be had and taken to be fixtures and appurtenances of the said railways and a part thereof, and, except as hereinafter provided, shall be used and sold therewith and not separate therefrom."

The fifth paragraph contains the following language with reference to the authority of the trustee in the event of default: "to enter into and upon all and singular the premises hereby conveyed, or intended so to be, and each and every part thereof, and shall until the same be sold or surrendered to the mortgagor, its successors or assigns, as hereinafter provided, use, manage and operate the same by its superintendents, managers and servants or other attorneys or agents, making from time to time all repairs and replacements as may seem to it judicious, and collect and receive all tolls, freights, earnings, rents, issues and profits of the same and every part thereof."

This paragraph further provides that, "The mortgagor, its successors and assigns upon any default as herein specified will immediately upon demand made, deliver, surrender and yield up the railways, property, equipment and appurtenances hereby conveyed and transferred, or intended so to be, to the trustee who is hereby constituted their irrevocable attorney with power to enter upon and take possession of the said railways, equipment, lands, property and appurtenanc-

es immediately upon the happening of any default as aforesaid."

The sixth paragraph authorizes the trustee, in case of default, to sell "all and singular the said railways, property, equipment, franchises and appurtenances hereby conveyed or intended so to be."

The eighth paragraph authorizes the trustee under certain conditions to release portions of the mortgaged property, and concludes as follows: "The trustee shall also have power to allow the mortgagor, its successors or assigns from time to time to dispose, according to its or their discretion, of such portion of the equipment, machinery and implements at any time held or acquired for the use of the said railways as may have become unfit for such use, replacing the same by new, which shall at once be subject to the lien of these presents without any further conveyance or mortgage."

The fourteenth paragraph contains the following covenants and agreements: "The mortgagor shall and will until the bonds secured by this indenture are fully paid, make all necessary repairs and replacements to keep up the property, rolling stock and equipment hereby conveyed and transferred, and seasonably pay and discharge all taxes, assessments, charges and dues which may hereafter be imposed, assessed or levied upon all or any part of the property or franchises hereby conveyed, or intended so to be, and the said railways, equipment and property shall be kept free from any encumbrances or charges to the prejudice of this indenture and no conveyance shall be made to the prejudice thereof."

All of the bonds provided for in this mortgage were duly issued and are now outstanding in the hands of the public. It is to be noted that in the general granting clause the language used is as follows: "All machinery and tools now owned, or which may hereafter be owned, or acquired, by the mortgagor." This, it is to be observed, describes machinery and tools. Following the above excerpt is the language describing equipment, and this language is as follows: "And all locomotives, tenders, cars and other rolling stock and equipment, and all implements, fuel, materials and supplies *now owned or acquired by the mortgagor.*" It is significant that the mortgage when it refers to machinery and tools uses the phrase, "which may hereafter be owned or acquired," whereas in referring to equipment the language is "now owned or acquired." The term "now owned or acquired" would not seem to be equivalent

to "now owned or hereafter acquired." Manifestly the mortgage covers certain classes of after-acquired property, which are specifically enumerated, and in these classes is *not* found equipment. Railroad mortgages are not drawn by laymen, as are many of the ordinary mortgages involved in commercial transactions, but by lawyers specially trained in this branch of legal work, and as said by the trial judge: "Railroad mortgages are and for years have been drawn by men highly skilled in that branch of the legal profession, by men acquainted with and accustomed to make use of accuracy of expression."

The argument that rolling stock and equipment constitute appurtenances to a railroad is not sustained by the authorities, and here again the omission of the language clearly describing rolling stock and equipment of the railroad company is significant. Humphreys v. McKissock, 140 U. S. 304, 11 S. Ct. 779, 35 L. Ed. 473; Guaranty Trust Co. v. Atlantic Coast Elec. R. Co. (C. C.) 132 F. 68; Nelson, Benton & O'Donnell v. Iowa Eastern Ry. Co., 51 Iowa, 184, 1 N. W. 434, 439, 33 Am. Rep. 124; Hinchman v. Point Defiance Ry. Co., 14 Wash. 349, 44 P. 867.

The language of the Supreme Court of Iowa in Nelson, Benton & O'Donnell v. Iowa Eastern Ry. Co., supra, seems apposite here: "It may be safely assumed that all mortgages executed on railroads specially mention rolling stock as being included. Why is this done if it was regarded as real estate or as appurtenant thereto? Why the labored efforts of counsel sustained by the elaborate opinions of the highest court in this country, demonstrating that mortgages executed by such corporations, were liens on after-acquired rolling stock, if the same was an appurtenant to the realty?" Reasonably construed, we think it clear that, so far as the specific terms of this mortgage are concerned, it does not cover after-acquired equipment.

A perusal of the language contained in the covenants of this mortgage convinces that no one of them covers after-acquired equipment, nor do all of these covenants, considered together, evince an intention to cover such property.

The lower court, however, while sustaining this view, was of the opinion that the mortgage contained a grant of income with a similar power over income in the trustee after default, which taken with the covenants for repairs and replacements was the equivalent of an after-acquired property clause covering equipment. In support of this view the case of Louisville Trust Co. v.

Cincinnati Inclined Plane Ry. Co. (C. C.) 91 F. 699, 700, is cited. In the first place, it is to be observed that the mortgage here under consideration contains specific enumeration of certain classes of property, and confessedly contains an after-acquired property clause with reference to certain of those classes. In the Louisville Case, the sole description of the property granted was as follows: "All and singular, the railways, rails, bridges, and real estate, and all the tolls, income, issues, and profits to accrue from the same or any part thereof, belonging to or held by said company, and, all and singular, the cars and rolling stock, and also, all and singular, the franchises and property, real and personal, of said company, including said leased railway, together with all the rights, easements, incidents, and appurtenances unto the hereby granted premises belonging or in any wise appertaining."

In that case the court held that from the grant of income it was fair to presume an intention to create a lien on the subsequently acquired rolling stock. It is noticeable that in the Louisville Case the mortgage was entirely silent as to after-acquired property. The mortgage in the instant case, however, expressly covers after-acquired machinery and tools, which would seem clearly to negative the thought of any intention to mortgage any other class of after-acquired property. The rule "expressio unius est exclusio alterius" is applicable. Inferences or presumptions speak in the absence of evidence, but cannot be weighed in the balance as against evidence, and this mortgage does not leave the question of the intention of the parties open to inference or presumption, because it speaks on that subject. It is the settled doctrine that a mortgage will not be held to grant after-acquired property, unless it contains unmistakable language showing an intention so to do. Maxwell v. Wilmington Dental Mfg. Co. (C. C.) 77 F. 938; Baiz v. Coro & Le Vela R. R. & Imp. Co., 87 N. J. Eq. 438, 101 A. 395; In re Adamant Plaster Co. (D. C.) 137 F. 251. The doctrine of the Louisville Case is not applicable to this mortgage.

The decision in that case is bottomed on the maxim that "whoever grants a thing is supposed also tacitly to grant that without which the grant itself would be of no effect," or, as it has been expressed in Pullan v. Railroad Co., 4 Biss. 35, Fed. Cas. No. 11,461, cited in the Louisville Case: "When the use of a thing is granted, everything is granted by which the grantee may have and enjoy such use." But there is here no occasion to invoke either maxim or presumption. The mortgage speaks for itself. Confessedly this maxim must have its limitations, and as said in one of the briefs in this case: "The trouble with the maxim is it proves too much. A grant of rails would include locomotives, cars, and all equipment necessary for the operation of a railroad. It would not be necessary to include income at all. A grant of a house would include all the furniture, because surely a house would not be enjoyed without furniture. A grant of a factory would include all of the machinery, implements, and equipment. A grant of rails would include a grant of materials and supplies necessary to operate a railroad." The analogy might be further pursued, but it would seem unnecessary to do so.

The mortgage does, however, contain replacement clauses, and under these it was the duty of the mortgagor and its successors to maintain and replace the mortgaged equipment. Under this covenant the mortgagor, and its successors, were required to keep under the lien of this mortgage the same value amount of equipment as it existed at the time of the execution of the mortgage. In other words, the lien of this mortgage attached to all equipment owned by the Iowa Central at the time of its execution, and so much of the equipment thereafter acquired, either by itself or its successors, as was necessary to keep intact in value the equipment as it existed at the date of the execution of the mortgage. For reasons hereinafter stated, the replacement clauses in this mortgage were not affected by the sale of the property, nor by the subsequent consolidation of 1916.

Iowa Central First and Refunding Mortgage.

The special master and the trial court concurred in finding that this mortgage may be considered as having an after-acquired property clause covering equipment, but held that the operation of the clause was terminated by the closure agreement of January 1, 1912, or by the consolidation agreement of 1916. The granting clauses of the mortgage are as follows:

"The railway company ° * ° has executed and delivered these presents, and has granted, bargained, sold, released, conveyed, assigned, transferred, pledged and set over, and by these presents does grant, bargain, sell, release, convey, assign, transfer, pledge and set over, unto the trustee, party of the second part, and to its successors and assigns forever, all the railways, equipment, property, rights, franchises, premises, privileges and immunities now owned or which

shall be hereafter acquired by the railway company, and the bonds and shares of stock hereinafter described, together with the other property, real, personal and mixed, intended by these presents to be transferred and conveyed, being more particularly described as follows:

\*　　\*　　\*　　\*　　\*

"IX. All bridges, depots, station houses, engine houses, car houses, freight houses and car and machine shops, or other buildings; all fences, trestles, bridges and culverts; all kinds of machinery and tools owned by the railway company; all locomotives, engines, tenders, passenger or freight cars, and other rolling stock or equipment, and all fuel, material and other supplies of the said railway company, which structures, buildings, machinery and supplies were, or have become, or may hereafter become connected with, or necessary, useful or convenient for the use, maintenance and operation of the railways and premises by this mortgage conveyed, or either of them, whether the same were at the date of this mortgage held and owned, or may be hereafter constructed or acquired by the said railway company.

"X. All the things in action, contracts, claims and demands of the railway company in connection with or relating to the railways and premises conveyed by this mortgage, or any or either of them; all the franchises, corporate or otherwise, rights, privileges, immunities and exemptions of the railroad company now owned, or which may be hereafter acquired in connection with or relating to the said railways by this mortgage conveyed, or intended to be conveyed, or any of them, together with all and singular the tenements and appurtenances belonging or in any wise appertaining to the said property and premises hereby mortgaged, and the reversions, remainders, and also all the estate, right, title and interest whatsoever, as well at law as in equity of the railway company of, in and to the same, including all the railways, equipment and other property of the railway company *which may hereafter be acquired.*"

The preceding paragraph X is similar to paragraph VII of the granting clauses of the Minneapolis & St. Louis first and refunding mortgage already considered, except that the words, "except that this mortgage shall not constitute a lien or encumbrance upon any railways, property or equipment which shall be acquired by the railroad company after all the bonds secured hereby, which are under the terms and provisions of this mortgage to be issued only for extensions, improve-

ments and equipment, shall have been sold or disposed of," appearing at the end of paragraph VII of the granting clause of the Minneapolis & St. Louis first and refunding mortgage, are absent from paragraph X of the granting clause of the Iowa Central first and refunding mortgage.

After referring to the granting clause in this mortgage in general terms, the lower court referred to the similarity of the language contained in this mortgage and that contained in the Iowa Central first mortgage, concluding, for the reasons stated in his conclusions relative to the Iowa Central first mortgage, that the mortgage now under consideration contained an after-acquired property clause applicable to equipment. Inasmuch as the lower court held that the Iowa Central first mortgage covered after-acquired equipment, this statement of the court's view was doubtless warranted. As we have held that the Iowa Central first mortgage does not contain an after-acquired property clause covering equipment, we fear the statement of the lower court relative to the similarity of the language contained in these mortgages might lead to misunderstanding. The Iowa Central first and refunding mortgage contains the above-quoted paragraphs IX and X, which are not present in the Iowa Central mortgage. The closing words of paragraph X, "including all the railways, equipment, and other property of the railway company which may hereafter be acquired," are very comprehensive. There is nothing in the granting clause of the mortgage limiting this general language or inconsistent therewith, and it seems clear that it was the intention that the mortgage should cover after-acquired rolling stock and equipment.

It therefore becomes necessary to consider the effect of the closure agreement of 1912, the sale by the Iowa Central of its properties to Minneapolis & St. Louis No. 4, and the consolidation agreement of 1916. We have already discussed, in connection with the Minneapolis & St. Louis first and refunding mortgage, the effect of a closure agreement similar, though not identical, with the one closing the Iowa Central first and refunding mortgage, and what is there said would seem to be applicable here, and it is unnecessary to discuss the particular phraseology of this closure agreement.

Before passing from this question, however, it would seem proper to notice the case of Railway Steel Springs Co. v. Chicago & Eastern Ill. Ry. Co. (D. C.) 246 F. 338, 347, referred to as authority for the prop-

osition that the agreement closing the Iowa Central First & Refunding Mortgage stopped the running of the after-acquired property clause of that mortgage. In that case the court says, inter alia: "Moreover, the Coal Railway mortgage contemplated extensions by the issue of further bonds under that mortgage. By the agreement of consolidation of 1894 that mortgage became a closed mortgage, and no further bonds could be issued under it. This plainly was intended to recognize the fact that an end was put to the after-acquired clause in that mortgage."

The difference between that case and the instant case is that in the former the after-acquired property clause, as pointed out by the court, was limited to property thereafter acquired *by the issue of further bonds,* whereas the granting clauses of the Iowa Central first and refunding mortgage apply to after-acquired property, whether or not acquired by the issue of further bonds. This distinction between the Chicago & Eastern Illinois Case, and the case at bar prevents the application of the doctrine of that case. This closure agreement, considered in connection with the various provisions in the mortgage dealing with "successors" to the Iowa Central, later referred to in this opinion, did not, in our opinion, have the effect of terminating the after-acquired property clauses in this mortgage.

 There remains to consider the effect of the sale by the Iowa Central of its properties to Minneapolis & St. Louis No. 4. As a general rule, an after-acquired property clause in a corporate mortgage extends only to the property subsequently acquired by the mortgagor, and does not cover property acquired by a consolidated company into which the mortgagor company has been merged, as against a mortgagee of the consolidated company. This rule, however, is subject to qualifications. There is no legal impediment to contracting for a survival of this after-acquired property clause, so that in the final analysis it simply becomes a question of contract, or perhaps, more correctly, a question of the intention of the contracting parties. If the surrounding circumstances and the contracts of the parties show that it was the intention of the parties to the original mortgage that the after-acquired property clause should embrace property acquired by the mortgagor's successor by a consolidation, sale, or otherwise, the property acquired by the successor company should be subject to the lien of after-acquired property clauses of the original mortgage. Compton v. Jesup (C. C. A.) 68 F. 263, 287, af-

firmed 167 U. S. 1, 17 S. Ct. 795, 42 L. Ed. 55; Trust Co. of Am. v. City of Rhinelander (C. C.) 182 F. 64; Commercial Trust Co. v. Chattanooga Ry. Co. (D. C.) 281 F. 856; Citizens Savings & Trust Co. v. Cincinnati & D. Traction Co., 106 Ohio St. 577, 140 N. E. 380; Hamlin v. Jerrard, 72 Me. 62; In re Sentenne & Green Co. (D. C.) 120 F. 436.

In Compton v. Jesup, supra, referred to as the leading case on this subject, in an opinion by Judge Taft, it is among other things said: "The question remains, therefore: What did the mortgagors intend to mortgage? Did they intend to limit the effect of the after-acquired property clauses to that which was acquired under their own franchises, or did they intend to make the clauses cover every addition and accession to the same railroad which they were constructing and operating, whether that railroad passed into the hands of a new company, with new franchises, or continued in operation under the then franchises? There can be no doubt of the intention of the parties upon this point. It was the road of the two mortgagor companies, made and to be made together, with the necessary depot grounds and depot buildings, erected and to be erected. * * * It was obviously the intention of each of the mortgagor companies that whatever was added to the railroad at each of the terminal points named for use as part of it should be embraced by the mortgage."

Having in mind the test announced by Judge Taft in Compton v. Jesup, supra, it is important to consider in this connection, first, "what property did the mortgagor have power to mortgage?" and, second, "what property did the mortgagor intend to mortgage?" At the time of the execution of this mortgage the Iowa Central was the owner of certain lines of railroad and franchises, and it thereafter acquired additional property, including the new Keithsburg Bridge, and by conveyance from the Iowa Central & Western Railway Company, the line of railway between Belmond and Algona, Iowa. Hence, when the Iowa Central executed this mortgage, it also had power to mortgage property used or acquired to be used on or in connection with the railroad system operated by it.

We have already held that it was the intention of the parties to mortgage after-acquired property, including rolling stock and equipment, and the question is whether or not it was the intention to mortgage the equipment acquired by its successor. Sec-

tions 1 and 2 of article IX of the mortgage provide as follows:

"Section 1. All the covenants, stipulations, promises and agreements in this indenture contained, by or in behalf of the railway company, shall bind its successors and assigns, whether so expressed or not.

"Section 2. Nothing contained in this indenture, or in any bond hereby secured, shall prevent any consolidation or merger, of the railway company with any other corporation, or any conveyance and transfer, subject to the continuing lien of this indenture and to all the provisions thereof, of all the mortgaged premises as an entirety to a railroad corporation at that time existing under and by virtue of the laws of the United States or of any state or states, and entitled to acquire the same: Provided, however, that such consolidation, merger or sale shall not impair the lien and security of this indenture, or any of the rights or powers of the trustee or of the bondholders hereunder, and that, upon any such consolidation, merger or sale, the due and punctual payment of the principal and interest of all of said bonds according to their tenor, and the due and punctual performance and observance of all the covenants and conditions of this indenture, shall be assumed by the corporation formed by such consolidation or merger, or purchasing as aforesaid."

Section 3 of the same article provides in part as follows:

"Section 3. In case the railway company, pursuant to section 2 of this article, shall be consolidated or merged with any other corporation, or shall sell, convey or transfer, subject to this indenture, all the mortgaged premises as an entirety as aforesaid, the successor corporation formed by such consolidation or into which the railway company shall have been merged, or which shall have purchased and received a conveyance and transfer as aforesaid, upon executing, and causing to be recorded, an indenture with the trustee, satisfactory to the trustee, whereby such successor corporation shall assume the due and punctual payment of the principal and interest of said bonds and the performance of all the covenants and conditions of this indenture, shall succeed to, and be substituted for, the railway company, party of the first part hereto, with the same effect as if it had been named herein as such party of the first part. * * * "

By article V of the consolidation agreement of May 10, 1916, the parties thereto agreed that:

"Except as herein otherwise expressly provided, all the debts, liabilities and obligations of each of the parties hereto shall be deemed and taken and they are hereby declared to be from and after the first day of July, 1916, the debts, liabilities and obligations of the consolidated company."

By these agreements the successors of the Iowa Central Company were substituted for the original mortgagor and became the original debtors, and bound themselves to carry out all the conditions and obligations of the original mortgagor. These successors are bound by all the provisions of this mortgage, including its after-acquired property clauses.

The question of laches and estoppel have already been discussed in connection with the consideration of the Minneapolis & St. Louis first and refunding mortgage. Substantially the same facts bearing upon this question were there considered, and we reach the same conclusion here as we reached in respect to that mortgage.

### The Keithsburg Bridge.

In connection with the Iowa Central first and refunding mortgage, the question of the status of the Keithsburg Bridge is presented. Was this bridge included under the lien of the Iowa Central first mortgage? The special master and the lower court held that it was not, but, on the other hand, that the Iowa Central first and refunding mortgage contained specific language covering the bridge, and that it was the intention of the Iowa Central Railway Company that the bridge should be covered by that mortgage as a first lien. With this holding we entirely agree, and any further discussion of this question would serve no useful purpose. The reasons set out in the opinion of the lower court sustain this view.

### Des Moines & Ft. Dodge First Mortgage.

This mortgage bears date January 1, 1905, and the company was authorized to mortgage after-acquired property; hence the question remains: Did it in fact do so? The lower court, after reviewing the provisions of this mortgage, held that there was no after-acquired property clause in the granting language of the mortgage, and no apt words, either there or elsewhere in the mortgage, from which an intention to mortgage after-acquired property could fairly be inferred, and that there was no mortgaging of income, and that there was no covenant to replace equipment.

It seems clear that the language of this mortgage compels this construction. The contention that there is in the mortgage a granting of income based on the provision as to "bills receivable, traffic balances and claims," and the provision under section 2 of Article 3 entitling the trustee to collect and receive tolls, earnings, income, etc., is not tenable. This provision relates only to the situation after default.

What has heretofore been said with reference to presumptions or inferences is equally applicable to this mortgage—"expressio unius est exclusio alterius." The parties have not relied upon inferences and presumptions, but have definitely, and with particularity, described the property to be covered by the mortgage.

### Refunding and Extension Mortgage.

This mortgage bears date January 1, 1912, and is subsequent in time to the other mortgages involved in this litigation. It is found by the decree to be a lien upon all the property of the present Minneapolis & St. Louis Railroad Company, subject to the other mortgages in foreclosure. It is found to be a first mortgage, however, upon the railway line extending from Watertown, S. D., to Leola, S. D., and from Conde, S. D., to Le Beau, S. D. The appeal of the trustee under this mortgage is from that part of the decree holding that the Iowa Central first mortgage, dated August 1, 1888, is a first lien, subject to certain underlying liens enumerated in the decree, on equipment acquired subsequent to January 1, 1912, to the value of $290,486, and from the decree in so far as it fails to hold that this mortgage constitutes a valid and subsisting lien upon all the equipment described in parcel 3 of lot 7 of article 25 of the decree. The decree adjudging that the Iowa Central first mortgage is a lien on equipment acquired subsequent to January 1, 1912, to the value of $290,486, is based upon the conclusion of the trial court that the Iowa Central first mortgage contained effective after-acquired property clauses covering equipment, but which clauses were terminated by the closure agreement of January 1, 1912.

Having determined that the Iowa Central first mortgage does not contain such after-acquired property clauses covering equipment, but that it does contain effective provisions for renewal and replacement of equipment, and that there should be allocated to the Iowa Central first mortgage from the equipment purchased, either by the Iowa Central or its successors, sufficient equipment to keep intact in value the equipment covered by the mortgage at the date of its execution, it follows that the decree will be modified in this regard. We have held that neither the closure agreement of January 1, 1912, nor the sales or consolidations involved in these appeals had the effect of terminating the after-acquired property clauses contained in the Minneapolis & St. Louis first and refunding mortgage and the Iowa Central first and refunding mortgage. The decision as to the liens of these mortgages will of necessity require a modification of the decree with reference to the lien of the refunding and extension mortgage in conformity herewith.

### Iowa Central and Minneapolis No. 4 Equipment Trust Notes Series A and B.

Certain of the appellants contend that the use of the refunding and extension mortgage bonds to reimburse the Iowa Central and Minneapolis & St. Louis for the payment of equipment obligations did not have the effect of making the refunding and extension mortgage a prior lien upon such equipment. The special master found that paying off of the equipment trust obligations subsequent to 1912 in part by the use of refunding and extension mortgage bonds had the effect, through subrogation, of placing the refunding and extension mortgage pro tanto in the place of the lien of the equipment trust obligations, and hence prior to the first and refunding mortgage. The holding of the master was affirmed, but not discussed, by the trial court.

In referring to this issue, the special master, in his memorandum opinion, among other things, says: "The evidence is clear that the following procedure was had, briefly stated: Purchase of equipment, paid for out of general funds, certified to the trustee, bonds issued, sold, or hypothecated, amount of bonds so issued carried to capital account, and the general treasury reimbursed for the moneys previously expended. The steps in this process naturally were not taken instantly, but the entire transaction was a matter of some time. As affecting the rights of the mortgagee, in the judgment of the master, the process indicated above cannot have the result contended for [by counsel for the Iowa Central first mortgage]. The mortgage itself provided for the disbursements of moneys for the purposes indicated therein. When such disbursements were made, certified to by the proper officers of the company, then the mortgagor was authorized to draw down bonds to the amount as certified to the trustee. The issue of the bonds then following,

the treasury was reimbursed, and the amount of the expenditure charged to capital account. The general process is to be found in nearly all of the railroad mortgages under consideration, and, except as to these companies where the initial issue of bonds corresponds with the total authorized, the procedure is common to all railroad mortgages. The method adopted by the Minneapolis & St. Louis road in issuing refunding and extension bonds was the one prescribed in the mortgage, and the usual and customary procedure in mortgages providing for the issuance of bonds from time to time after their execution, and an initial issue of securities less than the amount authorized. If the lien of the mortgage fails to attach under such circumstances, the same rule should apply to all mortgages under consideration. The record shows that bonds were issued from time to time under the Iowa Central first and refunding and other mortgages, where the disbursement of money for a specific and authorized purpose was certified by the proper officials of the railroad company to the trust company, and thereupon bonds were issued and delivered to the railroad company, the expenditure charged to capital account, and the treasury reimbursed in respect to the original outlay."

The legal title to equipment notes was not acquired by the Iowa Central or Minneapolis & St. Louis No. 4. Title was not finally acquired to this equipment until 1919 and subsequently, when it was acquired by the Minneapolis & St. Louis No. 5. The special master awarded to the refunding and extension mortgage an undivided interest in the equipment secured by it of the four issues of equipment trust certificates based upon the percentage which the certificates of each issue paid off bore to the total amount of the certificates of such issue. The court affirmed this part of the master's report, and this holding is reflected in the final decree, which allocated the equipment securing such four issues of the equipment trust certificates by giving certain percentages to the first and refunding mortgage and a percentage to the refunding and extension mortgage, both of series A and B, of the Minneapolis & St. Louis and of the Iowa Central. The holding of the court in so decreeing is sustained by the authorities, and we concur therein. Westinghouse Elec. & Mfg. Co. v. Brooklyn R. T. Co. (D. C.) 276 F. 152; Miss. Valley Trust Co. v. Southern Trust Co. (C. C. A.) 261 F. 765; Commercial Trust Co. v. Chattanooga Ry. Co. (D. C.) 281 F. 856; Farmers' Loan & Trust Co. v. Denver L. G. R. Co. (C. C. A.) 126 F. 46.

### Intervention of the Hawley Committee.

This committee represents holders of bonds under the refunding and extension mortgage. The committee did not participate in the trial of the suit, but came into this court by intervention, after the case had been set down for oral argument. It is the contention of this committee that the deposit of $2,495,000 of bonds issued under this same mortgage to secure loans from the government was invalid, because of the alleged failure of the mortgagor railway company to secure an authorization for the issuance thereof under section 20a of the Interstate Commerce Act (section 439, Transportation Act 1920 [49 USCA § 20a]). The issue is one of fact, which was not presented to the trial court. By final decree the court adjudged that these deposited bonds were existing obligations of the mortgagor secured by this mortgage. The decree is presumed to be sustained by the evidence. The issue, not having been raised in the trial court, cannot properly be urged in this court on appeal. These parties, having sat idly by during the trial, and until after all the appeals were perfected and the time for appeal had expired, are not now entitled to urge this question in this court. They are not appellants, they have filed no assignments of error in the lower court, and the time for appeal had expired before they applied for leave to intervene in this court. To permit questions of such grave importance to be so raised would demoralize and make impossible the orderly conduct of litigation. The intervention should be dismissed.

### White Bear Lake Branch.

Under date of November 29, 1901, the Northern Pacific Railway Company took a deed from Minneapolis & St. Louis No. 4 for the so-called White Bear Lake line, approximately 15 miles in length, extending from Minneapolis to White Bear Lake Junction, subject to the following mortgages: (1) The mortgage of Minneapolis & Duluth Railroad Company, dated January 1, 1877, securing $280,000 principal amount of 7 per cent. bonds, which became due January 1, 1907; (2) the Merriam Junction mortgage; (3) the Minneapolis & St. Louis first consolidated mortgage; (4) the Minneapolis & St. Louis first and refunding mortgage.

This branch of the railway was constructed by the Minneapolis & Duluth Railroad Company, and was afterwards included in a merger, thereby becoming Minneapolis & St. Louis No. 2. The Minneapolis & St. Louis No. 2 was sold under receivership and pur-

chased by Minneapolis & St. Louis No. 3. Minneapolis & St. Louis Nos. 1 and 2 were personally liable on the White Bear Branch mortgage first above referred to, but Minneapolis & St. Louis No. 3 did not assume payment of that mortgage, nor in any way become liable for its payment. Minneapolis & St. Louis No. 3, by consolidation, as has been stated herein, became Minneapolis & St. Louis No. 4. It was with Minneapolis & St. Louis No. 4 that the Northern Pacific had the dealings which gave rise to this controversy. This branch was under lease to the St. Paul & Duluth Railroad Company from 1882 to 1900. In April, 1900, the Northern Pacific acquired the St. Paul & Duluth, and thereupon gave notice that it would surrender the lease. The rental was based upon a valuation of $280,000, the amount of the first mortgage. The Northern Pacific and the Minneapolis & St. Louis then devised a plan of purchase whereby the former was to pay the interest on the bonds and pay the bonds at maturity, taking the bonds into its possession, and keeping them and the mortgage alive for its protection.

Contemporaneous with the taking of the deed these companies entered into the following written agreement:

"This agreement made the 29th day of November, 1901, by the Minneapolis & St. Louis Railroad Company, a corporation organized under the laws of Minnesota, party of the first part, and Northern Pacific Railway Company, a corporation organized under the laws of Wisconsin, party of the second part, witnesseth:

"Whereas, the Minneapolis & Duluth Railroad Company, the former owner of the Minneapolis & Duluth Railroad, extending from the city of Minneapolis to White Bear, in Ramsey and Hennepin counties, Minnesota, mortgaged the same to the Fidelity Insurance Trust & Safety Deposit Company of Philadelphia, trustee, by an instrument bearing date May 1, 1877, and there are outstanding, secured by said mortgage, bonds to the amount of $280,000 maturing May 1, 1907, and bearing seven per cent. interest; and

"Whereas, the said railroad now belongs to the Minneapolis & St. Louis Railroad Company and is incumbered by mortgages subordinate to the first mortgage, which said subordinate mortgages cover also other railways and property; and

"Whereas, the parties have agreed on a sale of said railroad by the said party of the first party to the party of the second part on terms expressed in a conveyance duly executed herewith and bearing the same date, the main consideration of said deed being the assumption by the grantee of said first mortgage, and it is found impracticable to presently clear the title to said railroad from said subordinate mortgages, and it is desired so far as possible to protect the title of the grantee under said deed: Therefore and in consideration of the premises the parties agree:

"1. The Northern Pacific Company agrees to pay the interest as it falls due upon said first mortgage bonds, and to pay the principal sum of said bonds ($280,000) when it matures. When the said bonds are paid they shall be placed in possession of the Northern Pacific Company and held by it for the purpose only of protecting its title as hereinafter provided. They shall not be exchanged for or converted into first and refunding mortgage bonds of the Minneapolis & St. Louis Company under mortgage dated March 1, 1899.

"2. The Northern Pacific Company agrees to keep an accurate account of all expenditures for additions, betterments and improvements upon or to said railway and property, but not including expense of mere repairs and maintenance.

"3. In case the title of the Northern Pacific Company under said deed shall ever be set aside, invalidated or extinguished by foreclosure or otherwise (except in case of some default of the Northern Pacific Company in the performance of any of the terms or provisions of this agreement on its part to be performed) it shall have a lien on all of said railway and property for the principal sum of said first mortgage bonds, plus its expenditures, with six per cent. interest from their several dates for all additions, betterments and improvements, as defined in the last preceding paragraph."

The deed executed simultaneously, and under which the Northern Pacific went into possession, contained, among others, the following:

"To have and to hold to the said grantee, its successors and assigns forever.

"The said property is subject to a first mortgage bearing date May 1, 1877, made by the Minneapolis & Duluth Railroad Company to the Fidelity Insurance Trust & Safe Deposit Company of Philadelphia, under which bonds are outstanding in the amount of $280,000, maturing May 1, 1907, and bearing 7 per cent. interest.

"This deed is made subject to said mortgage and said bonds which the grantee as-

sumes and covenants to pay, together with interest thereon from July 1, 1901.

"Except as against said mortgage and bonds the grantor covenants to forever warrant and defend the title hereby conveyed against the lawful demands and claims of all persons whomsoever."

These instruments were both duly acknowledged and recorded. The Northern Pacific Company entered into possession of the property under the agreement and deed, paid the interest on the mortgage as it fell due, and on its maturity took up the bonds, holding them uncanceled, and the mortgage has not been satisfied of record.

The lower court held that, by virtue of the provisions of the agreement under which the Northern Pacific Company went into possession of this property and paid these bonds, it was entitled to protection and that a merger did not take place. This holding is the storm center of attack by various appellants, who contend that, by payment of this $280,000 mortgage, the mortgage became merged in the title, and that the White Bear Branch is therefore subject to foreclosure sale under the lien of other mortgages, free and clear from any lien on the part of the Northern Pacific Railway Company arising out of the $280,000 mortgage.

It is said to be a general rule that the acquisition of the equity of redemption in mortgaged premises by the mortgagee results in a merger of the two estates, vesting the mortgagee with the complete title and putting an end to his right or title under the mortgage. But this general rule as to merger has so many exceptions and modifications that to call the rule a general one is almost a misnomer. Merger is dependent almost entirely upon the intent of the parties, particularly the intent of the mortgagee, and courts of equity are loath to declare a merger unless such result is the manifest intention of the parties to the transaction. Platte Valley C. Co. v. Bosserman-Gates Live Stock & Loan Co. (C. C. A. 8) 202 F. 692, 696; Barnes v. Cady (C. C. A.) 232 F. 318; Wilcox v. Davis, 4 Minn. 197 (Gil. 139); Horton v. Maffitt, 14 Minn. 289 (Gil. 216), 100 Am. Dec. 222; Hall v. Southwick, 27 Minn. 234, 6 N. W. 799; Factors Inc. Co. v. Murphy, 111 U. S. 738, 4 S. Ct. 679, 28 L. Ed. 582; Gray v. Nelson, 77 Iowa, 63, 41 N. W. 566, 568; McElhaney v. Shoemaker, 76 Iowa, 416, 41 N. W. 58; Harrington v. Feddersen (Iowa) 226 N. W. 110; 41 C. J. pp. 776-780; 19 R. C. L. pp. 488-489.

The author of the article on mortgages in 41 C. J. at pages 776, 777, says: "The question of whether a conveyance of the equity of redemption to the mortgagee results in a merger of the mortgage and fee is primarily one of the intention of the mortgagee. The mortgagee has an election in equity to prevent a merger and keep the mortgage alive, which he may do for his own protection as against other liens or incumbrances, even though he does not indicate his intention for a long time after the conveyance of the equity to him and not until another is about to acquire from him an interest in one of the estates; however, a mortgagee's expressed purpose against a merger will not operate to prevent it where it is restricted to a contingency which does not happen."

Again this author at page 780 says: "Where necessary to enable the mortgagee to defend his rights under his mortgage against intervening liens of third persons, a merger will not be held to have resulted if his intention to that effect is shown, or if there is nothing to rebut the presumption that his intention corresponded with his interest."

The author of the article on mortgages, in 19 R. C. L. p. 489, supra, says: "Unless an intention to merge with knowledge of a junior lien or liens clearly appears, no merger results from the acquirement, by the holder of the senior mortgage of the interests of the mortgagor, and the senior mortgage retains its priority as against all junior or intervening liens upon the mortgaged property; and this is true whether the interest of the mortgagor is the legal title to the land or the mere equity of redemption. *It is only when the fee and the lien center in the same person, without any intervening claims, liens, or equities, that a merger of the title and the lien will take place.*"

The doctrine is well stated by this court in an opinion by Judge Sanborn, in Platte Valley C. Co. v. Bosserman-Gates Live Stock & Loan Co., supra: "But a third person, not a volunteer, who pays and procures a release of a first lien upon property under an agreement with the owner that as purchaser, or first lienor, he shall have the pecuniary benefit of such payment, becomes subrogated in equity, as against an inferior lienor whose burden is not increased by such subrogation, to the rights held by the first lienor before the payment was made. * * * This is a just and reasonable rule. It effects the intention of the parties, preserves to the payor the benefit of his payment, leaves the inferior lienor in his former position, inflicts

no injury upon him, prevents injury to the payor through mistake or ignorance of the inferior lien, and works exact justice to all."

In this connection it should be noted, as pointed out by the lower court, that this property was not conveyed to the Northern Pacific Railway Company by a mortgagor. The Minneapolis & St. Louis No. 4 was not the maker of the mortgage which was assumed by the Northern Pacific Railway Company, nor had the Minneapolis & St. Louis No. 4, nor the Minneapolis & St. Louis No. 3 ever assumed or agreed to pay the mortgage.

In the instant case nothing is left to inference or presumption, because the intention of the paries is made a matter of written agreement, and it conclusively appears therefrom that neither the grantor nor the grantee intended that a merger should result. In fact, the only purpose of the written agreement was to prevent a merger, and to protect the grantee, the Northern Pacific Railway Company, in the payment of this mortgage.

The agreement provides that, if the title of the Northern Pacific Company shall ever be set aside, invalidated, or extinguished by foreclosure or otherwise, it shall have a lien on all said railway property for the principal sum of the mortgage, plus its expenditures. This was not a fraud upon any of the other mortgagees. The payment of the mortgage under the agreement simply amounted to a conditional purchase of it by the Northern Pacific. The contingency has arisen which was contemplated by the parties, and that company is asking a court of equity to protect it against the subordinate mortgages.

It is argued that subrogation cannot result from the payment of this mortgage by the Northern Pacific Railway Company, because the company was obligated to make this payment. This might be true if the payment were made without any agreement or reservation, but where, as in the instant case, such payment was made pursuant to a specific agreement that under certain contingencies subrogation should result, then the rule invoked is not applicable.

The agreement amounted to an equitable assignment of the mortgage upon payment of the bonds, and a preservation of the lien of the mortgage so as to protect against the junior liens. Under such circumstances, on payment of the bonds, the Northern Pacific Company was subrogated to the rights of the mortgagee. Capitol Natl. Bank v. Holmes, 43 Colo. 154, 95 P. 314, 16 L. R. A.

(N. S.) 470, 127 Am. St. Rep. 108; Kellogg v. Ames, 41 N. Y. 259; Coles v. Appleby, 87 N. Y. 114.

Any other conclusion would work a manifest injustice to the Northern Pacific Company. There is no claim that the property was worth more than the Northern Pacific paid for it. It parted with its money, which it would lose to the junior lienholders, if they can now come in and assert priority of their liens. In the words of Judge Sanborn in Platte Valley C. Co. v. Bosserman-Gates Live Stock Co., supra: "This is a just and reasonable rule."

The decree of the lower court should not be disturbed, in so far as it protects against merger of the lien of the $280,000 mortgage, and it remains to consider the provisions of the decree awarding a lien to the Northern Pacific Railway Company on account of betterments superior to the lien of the Merriam Junction-Albert Lea first consolidated and the first and refunding mortgages.

The court made an allowance for advancements and betterments placed on this branch since 1901 of $164,492.74. The Northern Pacific was in effect a mortgagee in possession, and as such it could incur only such expenses as were reasonably essential to the preservation of the railroad as a going concern. If it desired to make betterments for the purpose of making the property more serviceable in connection with its other lines, that burden must be borne by itself. The item involved in the change of location in the highway, known as the White Bear yards, was an expenditure for the convenience or improvement of the Northern Pacific Railroad as a system. It was allowed $42,589.83 for this expenditure as a lien ahead of other mortgages. This item should be disallowed. The expenditure made for grade separation, amounting to $53,763.32, which is strenuously objected to by appellants, was necessitated because of the character of the property, and was ordered by the public authorities. This was therefore a necessary expenditure, and should be allowed, as should the other items of expenditures allowed by the lower court.

It follows that the judgment and decree of the lower court should be modified on the record already made, in accordance with the views expressed herein, and the cause is remanded to the lower court for that purpose, and, as so modified, the decree should be and is affirmed. No costs will be taxed on these appeals for or against either or any of the parties thereto.